#24927-a-DG

**2009 SD 65**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                  Plaintiff and Appellee,

  v.

SEAN RICHARD CARTER,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
BUTTE COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JOHN W. BASTIAN
Judge

* * * *

LAWRENCE E. LONG
Attorney General

FRANK GEAGHAN
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                          and appellee.

STACY L. REINDL
Spearfish, South Dakota                 Attorney for defendant
                                          and appellant.

* * * *

CONSIDERED ON BRIEFS
ON APRIL 27, 2009

OPINION FILED **07/22/09**

#24927

GILBERTSON, Chief Justice

[¶1.]		Defendant was convicted of aggravated assault based on the testimony of his co-perpetrators and an eye witness who placed him at the scene of the crime. On appeal, Defendant alleges the trial court erred when it did not permit him to impeach the eye witness who placed him at the scene after she testified consistently with her prior statements to police. Defendant also contends that there was insufficient evidence to support the conviction. Finally, Defendant argues that the trial court's use of an aiding and abetting instruction was without support in the evidence. We affirm.

## FACTS

[¶2.]		On October 27, 2007, Justin Scott (Scott), Ivan Rosander (Rosander), and Ryan Ollerich (Ollerich) ended their day working cattle by having dinner in Belle Fourche, South Dakota. The three men then went to the Cowboy Back Bar for drinks where they met Libby Huber (Huber). Huber invited the men to a house party approximately two to three blocks from the bar. Huber, Scott, Rosander, and Ollerich along with Huber's friends Bobbi Satzinger (Bobbi) and her husband Jim Satzinger (Jim), and Dee Dee Farghali (Farghali) arrived at the house party a little after 2 a.m. They immediately recognized that they did not fit in with the others in attendance. The other attendees were later described as being "goths," as well as much younger than the late arrivals.[1] In addition, Scott and Ollerich were wearing

---

1.	"Goth" is described as "a style of fashion characterized by black clothes, heavy silver jewelry, black eye make-up and lipstick, and often pale face makeup." Boroff v. Van Wert City Bd. of Educ., 220 F3d 465, 466 (6thCir 2000) (quoting

(continued . . .)

-1-

cowboy hats that made them stand out in the crowd as being cowboy or rancher oriented.

[¶3.] At the party, words were exchanged between the "cowboys" and the "goths," and it appeared that a fight might break out due to the conflict between the two groups. Scott and Ollerich testified that they had remained at the front door most of the time they were at the party with Huber, the Satzingers, and Farghali due to their discomfort with the atmosphere and the prospect of a fight. Finally, the "goths" demanded the "cowboys" leave the party.

[¶4.] After the "cowboys" left the party, a small fire was discovered in the backyard, which the "goths" alleged the "cowboys" had started. Several of those in attendance at the party decided to pursue the "cowboys." Sean Richard Carter (Defendant) and another man, Courtney Rodriguez (Rodriguez), led the way as they and Orin Schulze (Orin) and his brother Jeffery Schulze (Jeffery) chased after Scott, Rosander, Ollerich, and Huber in order to confront them about the fire.

[¶5.] Jim and Bobbi Satzinger left at the same time as the others, but they stopped to visit with some acquaintances who lived nearby and who were out on their lawn. The rest of the "cowboy" group proceeded down Railroad Street toward the Cowboy Back Bar parking lot to get Huber's car. As Jim and Bobbi were visiting, Bobbi saw a group of about four or five people from the party run past her along the path taken by Scott, Rosander, Ollerich, and Huber. Among the pursuers,

---

(. . . continued)
Encarta World English Dictionary (2000), http://dictionary.msn.com/find/entry.asp?search= goth).

Bobbi saw a tall white man wearing a black t-shirt on which the word "Security" was printed in big white letters. Bobbi had noticed the man earlier that evening first at the Outlaw Bar where she had previously been and again later at the house party. She also noticed a short, Hispanic man wearing glasses among the group. Bobbi had also observed the Hispanic man become confrontational and belligerent with the "cowboys" at the house party, and she thought he was looking for an excuse to start a fight.

[¶6.] Soon after Bobbi noticed the men from the party running toward the Cowboy Back Bar and her friends, Scott heard someone shouting from behind him. Scott was walking with Rosander and was about 100 feet behind Ollerich and Huber in the vicinity of Railroad Street and 4th Street. Scott turned around and saw four figures he assumed were men closing in on him. Huber turned around at the time the attack began and saw a "large, tall, white person" involved in an assault on Scott as well as a "little short Hispanic person with glasses on and two other people" involved in assaulting Scott and Rosander. As Ollerich turned to look back at the assault, he saw a police cruiser in the adjacent alley, ran to it, and reported the fight. As the fight was dispersing, law enforcement arrived on the scene.

[¶7.] By this time, Bobbi had walked down toward the corner of Railroad Street to see what was happening. Before she reached the corner, she saw some of the individuals who had pursued the "cowboys" running back toward the house party. Bobbi noticed the short Hispanic man again, but did not see the tall white man in the "Security" t-shirt. Those returning to the house party were saying

things like "that's what you get, that's what you get," and laughing. Bobbi returned to her husband and Farghali picked them up in her van and drove to the location of the fight to provide assistance.

[¶8.] After the assault ended, Rosander was unable to identify his attackers to the police. He was also not able to identify which of the attackers assaulted Scott. He was, however, able to describe Scott's injuries. Rosander noted that Scott's face and eyes were bloody and swollen, and that his leg was at a ninety degree angle at the ankle. Scott was face down in the street, conscious but unable to focus on what had happened, or provide any information about his condition or the attack.

[¶9.] Officers with the Belle Fourche Police Department arrived on the scene shortly after the attackers dispersed. Shortly before 4 a.m., police began looking for the men who had assaulted Scott and Rosander based on the descriptions provided at the scene. One of the suspects was reported to be wearing a camouflage jacket, and one was reported to be wearing a black t-shirt with the word "Security" printed on it in white letters. Several minutes after the fight, Officer William Earl (Earl) located three males walking approximately one- to one-and-half blocks away from the intersection where the fight occurred. Earl questioned the men as to whether they had any knowledge of the assault. One man, the Defendant, stopped to speak with Earl while the other two walked away from the encounter. Earl radioed to another officer to stop the pair and attempt to engage them in conversation.

[¶10.] Defendant was wearing a camouflage jacket with a black t-shirt. Earl immediately noticed that Defendant's t-shirt was inside out and he could see that

something was printed on it. Earl asked Defendant to turn his shirt right side out and the word "Security" was visible in bold white lettering. There was no blood or other evidence of a fight visible on the t-shirt. Earl asked to see the Defendant's hands, which he determined did not have any cuts or bruises that indicated a recent fight. A small bruise and scratch on Defendant's arm were determined to be a prior injury that Defendant claimed was work related. Defendant denied any involvement in the assault and claimed he had no knowledge that a fight had occurred. Earl was unable to detain Defendant based on the information he had at the time or to examine Defendant's shoes.

[¶11.] Defendant's companions were intercepted by another officer and later questioned by Earl. They gave their names as Orin Schulze and Jeffery Schulze. Jeffery had a broken right hand as well as cuts and dried blood on his hand. The brothers were taken to the police station where they admitted they had been in the fight with the "cowboys," but that they had acted in self defense. Orin eventually gave a written statement that indicated he had struck Rosander. Jeffery's statement indicated that he had broken his hand while fighting with Scott. The brothers were issued tickets for disorderly conduct and released.

[¶12.] Scott was taken to the Spearfish hospital. His injuries included a dislocated ankle and broken fibula that required surgery and several months off of work, as well as injuries to his face and head. One of Scott's eyes was completely swollen shut and so large that when looking at his face straight on his ear was not visible. Scott was not able to identify his attackers as he had little memory of the attack.

[¶13.]     A few days later, Orin and Jeffery were asked to return to the police station to provide further information. Their stories remained the same or very close to their stories on the morning of the attack. However, during a third police interview, Orin told Officer Larry Rohlf (Rohlf) that he ran into Rosander and began throwing punches, which Rosander returned and that they knocked each other to the ground. While the two were exchanging punches, Orin stated he heard his brother call out to him that Jeffery had lost his glasses. Orin stated he then disengaged with Rosander, found Jeffery's glasses, pulled him off of Scott, and the two ran away.

[¶14.]     Jeffery gave a similar statement. Jeffery recounted how he had thrown a flying "superman" style punch at Scott's head and knocked him to the ground. The two began wrestling and punching each other. Jeffery believed he had broken his hand when he attempted to punch Scott in the face and instead hit the pavement. Neither brother gave police any information regarding Defendant's participation.

[¶15.]     Huber was contacted by Rohlf by telephone and asked to describe the attackers and the events she recalled. Huber placed Defendant at the scene. An individual statement from Huber was not included in the original police report from the date of the attack. Instead, Rohlf's notes from the supplemental case report, which was not offered at trial, indicated that Rohlf had telephoned several witnesses on October 31, 2007. That report stated:

> [Bobbi] Satzinger, Huber, and Ollerich . . . state that they were all about one and a half blocks ahead of where the fight happened and could not see who was fighting for sure. It was

too dark and they were too far ahead. They could only tell there was a fight happening.[2]

[¶16.] On either November 1 or 2, Rohlf asked Defendant to return to the police station to provide additional information about the assault. Defendant voluntarily agreed to provide a videotaped statement. He explained that he had taken off running toward the Cowboy Back Bar after Scott, Rosander, and Ollerich, along with a tall blond man with a ponytail, a little guy with a bald head and glasses, and a tall man wearing a camouflage jacket.[3] Defendant told Rohlf that he had been at the fight scene but did not participate in the assault. Defendant said he was unable to give Rohlf any names because he was relatively new to the area and did not know the names of the individuals with whom he had run after the "cowboys." Defendant stated that the tall man in the camouflage jacket and the short man with the glasses jumped the "cowboys."

[¶17.] Defendant was eventually charged with one count of aggravated assault in violation of SDCL 22-18-1.1(1), a Class 3 Felony, and in the alternative

---

2.    The report appears to be mistaken as to Bobbi's physical location at the time of the fight. She was not with Huber and ahead of Scott when the assault occurred. She was behind the two groups and arrived at the scene of the fight after it was over and never saw the fight itself.

3.    The short man with glasses was also identified by Huber as being Hispanic. This individual was eventually identified as Courtney Rodriguez. Rodriguez was prosecuted separately for his participation in the attack.

one count of aggravated assault in violation of SDCL 22-18-1.1(4).[4] Jeffery and Orin were also charged with aggravated assault for their part in the attack on Scott. Trial on the charges against Defendant was held on April 28, 2008.

[¶18.] Huber testified at trial that she had observed Defendant at the Outlaw Bar where she had been prior to arriving at the Cowboy Back Bar. She also testified that she saw Defendant at the house party and again during the assault. Although she did not know his name at the time, she remembered Defendant by the black t-shirt he was wearing with the word "Security" in bold white letters printed on it. Huber identified Defendant in the court room as the man she saw that night wearing the "Security" t-shirt. She also testified she saw Defendant "hollering at Justin [Scott]," and then she saw Rosander push the attackers away from him. She further testified that she saw the Defendant assault Scott. The following questions were asked of Huber by the state's attorney on direct examination:

> Q. And what was he doing?
> A. Assaulting him.
> Q. Assaulting Justin [Scott]?
> A. Yes.
> Q. Was he kicking him?

---

4. SDCL 22-18-1.1 provides in relevant part:

> Any person who:
>
> (1) Attempts to cause serious bodily injury to another, or causes such injury, under circumstances manifesting extreme indifference to the value of human life;
> . . .
> (4) Assaults another with intent to commit bodily injury which results in serious bodily injury; . . .
>
> is guilty of aggravated assault. Aggravated assault is a Class 3 felony.

A.     Yes.

Counsel for Defendant immediately objected to the question as leading and moved

to strike.  Counsel's objection was sustained.  The state's attorney then continued:

Q.     What was he doing?
A.     Pushing him, beating him physically, harming him.
Q.     Was he doing anything with his foot?
A.     I didn't see that.
Q.     Did you see any kind of motion with his leg?
A.     No, because at that time my distraction was on Ivan [Rosander] and there was another distraction, the cops came down the alley way, too.
. . .

Q.     Do you recall having a phone conversation with Officer Rohlf?
A.     No, I don't.
Q.     You don't remember talking to him at all?
A.     No.

[¶19.]     On cross-examination, Defendant's counsel asked Huber the following:

Q.     So is it your testimony today that you don't recall telling Officer Rohlf that you could not see who was fighting for sure?[5]

Before Huber answered, the State objected based on Huber's previous answer that

she did not recall the conversation with Rohlf and, therefore, could not possibly

recall the context.  The trial court sustained the objection.  Defendant's counsel then

asked whether Huber recalled having a conversation with Defendant's private

investigator.  After Huber's answer in the affirmative, Defendant's counsel then

asked "And do you recall telling the private investigator  . . .?" and the State

_____

5.     The wording of this question to Huber posed by Defendant's attorney appears to have been taken directly from Rohlf's notes in the supplemental case report.  Rohlf's case report did not attribute the words to Huber as a direct quote, but rather the statement was used to summarize the information given by the three witnesses interviewed by Rohlf.

objected once again, this time on the basis of hearsay. The trial court sustained the objection.

[¶20.] The State also called Jeffery as a witness. Jeffery testified that he was one of the four men who pursued the "cowboys" from the house party, and that he had punched Scott in the head and then fought with him on the ground. Jeffery testified that he had entered into a plea agreement with the State, and in exchange for testifying truthfully at Defendant's trial Jeffery would enter a plea of guilty to one charge of aggravated assault. The plea agreement required the State to withdraw any additional charges as well as a Part II Information against Jeffery that was based on a sealed conviction. The State further agreed to remain silent regarding any request for a suspended execution of sentence and not ask for a particular sentence. The State remained free to comment on the facts of the case against Jeffery. Jeffery was required to pay restitution to Scott as part of the plea agreement.

[¶21.] Jeffery testified that he was the tall man in glasses involved in the altercation, that his brother Orin was the tall man in the camouflage jacket, that Rodriguez was the short bald man in glasses, and that Defendant was the fourth assailant described as a tall man wearing a black t-shirt with the word "Security" printed on it in bold white letters. Jeffery further testified that Rodriguez and Rosander got into an argument and a bit of pushing at the house party as the "cowboys" were about to leave. Jeffery and Orin then followed the Defendant and Rodriguez after they began pursuing the "cowboys." Defendant and Rodriguez were in the lead at first, but Orin was the first to engage with Rosander. Orin collided

with Rosander and the two ended up on the ground. Jeffery then "superman" punched Scott in the head or face, and Scott went down with Jeffery on top of him. As Jeffery and Scott were punching each other on the ground, Jeffery saw a big kick come in and make contact with Scott's head, which then bounced around from the force of the kick. Jeffery looked up and saw Defendant stepping in for another kick. While Defendant delivered somewhere between four and seven kicks to Scott, Scott grabbed onto Jeffery and would not let go. Jeffery further testified that the kicks were very hard, full football kicks to Scott's head, and possibly to other parts of his body. Jeffery also testified that his glasses fell off, and that he called out to his brother to find them. Orin disengaged with Rosander, retrieved Jeffery's glasses, and the two brothers ran off.

[¶22.] Jeffery then testified that the three men went to his house where Defendant tried to pull Jeffery's broken fingers and dislocated hand back into place. The three men then decided to walk to a convenience store for drinks and cigarettes. The three were stopped by Earl on their way back to Jeffery's home. Jeffery admitted he had withheld the truth from Earl that evening that Defendant was involved in the fight, and again when Jeffery was interviewed at the police station on two other occasions. Jeffery further admitted that it was not until his testimony at trial that he told the full truth for the first time. Jeffery also testified that he would be required to pay restitution to the victim for his role in the attack.

[¶23.] Orin was also offered a plea agreement. In exchange for his testimony, Orin agreed to plead guilty to one count of simple assault for his role in attacking Rosander. He was not called as a witness for the State. Orin was, however, called

as a witness for Defendant. Orin testified that he saw Defendant kick Scott in the head just as if Defendant were kicking a ball. Orin also testified that Defendant was wearing a black t-shirt with the word "Security" printed on it. He further testified that on the way back from the convenience store, that Orin had given Defendant the camouflage jacket to wear as it was cold outside.

[¶24.] Finally, Rohlf testified to the details of his investigation. On cross-examination, Defendant's counsel asked Rohlf if he had interviewed Huber. Using the transcript of Rohlf's October 31, 2007, telephone interview of Huber to refresh Rohlf's memory, Defendant's counsel asked: "As you wrap up your follow up investigation, Mr. Rohlf, what did you conclude regarding the multiple number of witnesses that were asked about whether [Defendant] kicked Mr. Scott in the head?"[6] The State objected on the basis of speculation. The trial court sustained the objection. Defendant's counsel made an offer of proof outside the presence of the jury. Counsel offered the testimony of Rohlf to impeach the testimony of Huber as to the details of her conversation with Rohlf, a conversation that Huber was unable to recall while testifying the day before.

[¶25.] The trial court refused the offer based on a hearsay objection by the State. The trial court found that Huber did not testify that Defendant had kicked Scott, but rather that Huber had testified she saw Defendant shouting, pushing, and physically assaulting Scott. After finding that Huber did not testify in a manner inconsistent with her statement to Rohlf during the investigation, the trial

---

6. The transcript of Rohlf's telephone interview with Huber was not contained in the record.

court noted that Huber could not recall the conversation with Rohlf. The trial court also refused the offer of the police report as hearsay to which the business record exception did not apply.

[¶26.]     At the close of evidence, the trial court instructed the jury on aggravated assault. It also instructed the jury on aiding and abetting under SDCL 22-3-3. That statute provides: "Any person who, with the intent to promote or facilitate the commission of a crime, aids, abets or advises another person in planning or committing the crime, is legally accountable, as a principal to the crime." SDCL 22-3-3. Defendant's objection to the aiding and abetting instruction was overruled. The verdict form did not specify whether the jury had a choice between convicting and acquitting Defendant as a principal for actually participating in the assault or as a principal under the aiding and abetting instruction. Instead, the verdict form provided only the choice between guilty and not guilty to the single count of aggravated assault in violation of SDCL 22-18-1.1(1).

[¶27.]     The jury returned a verdict of guilty. Defendant was sentenced to serve twelve years in the State Penitentiary with four years suspended on condition that Defendant pay court costs, prosecution costs, court-appointed attorney fees, and restitution to Scott. Restitution totaled almost $29,000; Defendant was ordered jointly and severally liable for it along with Orin and Jeffery. Defendant was also ordered to complete alcohol treatment and successfully complete anger management classes.

[¶28.]    Defendant appeals raising the following issues:

1.    Whether the trial court erred in limiting cross-examination of a witness Defendant's counsel sought to impeach.

2.    Whether the evidence was sufficient to sustain the verdict of guilty to the charge of aggravated assault.

3.    Whether the trial court erred when it instructed the jury on aiding and abetting.

## DECISION AND ANALYSIS

[¶29.]    **1.    Whether the trial court erred in limiting cross-examination of a witness Defendant's counsel sought to impeach.**

[¶30.]    Defendant argues that the trial court denied him the right to confront Huber and impeach her testimony when it sustained the State's objection to the question posed to Huber as to whether she remembered telling Rohlf that she could not see who was fighting for sure. He also argues that the State's hearsay objection to the question as to whether Huber recalled telling Defendant's private investigator that she did not see Defendant kick Scott during the attack also served to deny him the opportunity to impeach Huber by showing an inconsistent prior statement and bias. Defendant further argues that the trial court erred when it did not permit him to elicit testimony from Rohlf that Huber stated during her telephone interview on November 1, 2007, that she did not see Defendant kick Scott. That question was precluded by a hearsay objection by the State. Defendant argues that the answers to these three questions would have shown that Huber testified inconsistently with her prior statements.

[¶31.]    "A trial court's evidentiary rulings 'are presumed correct and are reviewed under an abuse of discretion standard.'" State v. Karlen, 1999 SD 12, ¶6,

589 NW2d 594, 597 (quoting State v. Larson, 1998 SD 80, ¶10, 582 NW2d 15, 17). A trial court's rulings on limiting cross-examination will be reversed on appeal only when there is a clear abuse of discretion as well as a showing of prejudice to the defendant. State v. Koepsell, 508 NW2d 591, 595 (SD 1993) (citing United States v. Crump, 934 F2d 947, 951 (8thCir 1991); State v. Bogenreif, 465 NW2d 777, 783 (SD 1991); State v. Honomichl, 410 NW2d 544, 548 (SD 1987)). Prejudice results when "a reasonable jury probably would have a significantly different impression if otherwise appropriate cross-examination had been permitted." State v. Johnson, 2007 SD 86, ¶35, 739 NW2d 1, 13. The trial court may limit cross-examination when a question has been asked and answered. *Koepsell*, 508 NW2d at 595 (citing SDCL 19-14-18). The trial court also has considerable discretion in determining whether testimony is "inconsistent" with prior statements. State v. Shaw, 2005 SD 105, ¶36, 705 NW2d 620, 631.

[¶32.] "The right to confront witnesses is guaranteed by the Sixth Amendment to the United States Constitution and by Article VI, section 7 of the South Dakota Constitution." *Johnson*, 2007 SD 86, ¶35, 739 NW2d at 12 (citing State v. Walton, 1999 SD 80, ¶25, 600 NW2d 524, 530). "This right is 'generally satisfied when the defense is given a full and fair opportunity to probe and expose a witness' infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.'" State v. Carothers, 2006 SD 100, ¶16, 724 NW2d 610, 617 (quoting United States v. Owens, 484 US 554, 558, 108 SCt 838, 841, 98 LEd2d 951 (1988)(quoting Delaware v. Fensterer, 474 US 15, 21-22, 106 SCt 292, 295, 88 LEd2d 15 (1985))). Moreover,

Confrontation Clause errors are subject to harmless error analysis under the following test:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Koepsell*, 508 NW2d at 595 (quoting Delaware v. Van Arsdall*,* 475 US 673, 684, 106 SCt 1431, 1438, 89 LEd2d 674 (1986) (citing Harrington v. California, 395 US 250, 89 SCt 1726, 23 LEd2d 284 (1969))).

[¶33.]     In the instant case, the trial court found that Huber did not testify inconsistently with her prior statements to Rohlf and to Defendant's private investigator. In both prior statements, Huber appears to have stated that she did not see Defendant kick Scott. While on the stand, Huber testified that she saw Defendant yelling, pushing, and hitting Scott. When asked in a leading manner by the State whether Defendant kicked Scott, Huber testified "yes," before Defendant objected to the leading question. Defendant's objection to the question was sustained. Huber then testified that she did not see Defendant do anything with his foot because her attention was elsewhere during the attack and not specifically on Defendant.

[¶34.]     Even if this Court were to determine that Huber's affirmative answer to the leading question of whether she saw Defendant kick Scott was not

disregarded by the jury after Defendant's objection was sustained, the two questions immediately following the objection made it clear that Huber did not see Defendant kick Scott. Thus, Huber did not testify inconsistently with her prior statements to Rohlf and Defendant's private investigator and there was nothing to impeach.

[¶35.] Defendant appears to argue that he should have been able to impeach Huber on what he describes as Huber's inconsistent statement because she was unable to recall speaking with Rohlf. Defendant also argues that his defense would have been aided by the jury hearing directly from Huber that she did not report to Rohlf that Defendant kicked Scott. He maintains that the jury would have been left with a completely different impression of her testimony. However, there was nothing available to impeach other than Huber's faulty memory and sensory perception as to speaking with Rohlf because Huber did not testify inconsistently as to the issue of kicking. Huber's statements throughout the investigation and her testimony at trial were that she never saw Defendant kick Scott. She appears to have told Rohlf in the October 31, 2007, interview that she saw Defendant assault, push, and yell at Scott and she testified to the same facts at trial.

[¶36.] Defendant was able to show through Rohlf's testimony that Huber was unable to recall the telephone conversation in which she told Rohlf that she did not see Defendant kick Scott. Defendant successfully exposed Huber's faulty memory regarding the telephone conversation, first through Huber's testimony and later through Rohlf's. There was nothing else to impeach Huber with at that point in the trial. The substance of her out-of-court statements to Rohlf and to Defendant's

private investigator was not inconsistent with her trial testimony and would have been cumulative at that point. The jury heard firsthand that Huber did not see Defendant kick Scott. Reiteration that she told Rohlf a few days after the attack and the private investigator a few days before trial the same thing would not have greatly impacted the jury, because there was no inconsistency between Huber's statements and her testimony from which the jury could draw a conclusion other than that Huber did not see the Defendant kick Scott.

[¶37.]     Even if this testimony had been permitted, it would not have accomplished anything more than Defendant was already able to do through the testimony of Huber and other witnesses at trial. As such, it would have been cumulative in nature. Defendant was able to elicit the same testimony from Huber at trial that Huber gave in her statements to Rohlf. Defendant was also able to show that no other witness testified that Defendant ever hit Scott as opposed to kicking him. Furthermore, Defendant was able to show that Huber's vantage point was approximately 100 feet from the fight, a considerable distance that may have accounted for the discrepancies between her testimony and that of Orin and Jeffery. The testimony Defendant claims on appeal would have made the difference was merely cumulative, contradicted by other witnesses, and served to place Defendant at the scene, something he had already admitted to Rohlf.

[¶38.]     Defendant also argues he was denied the right to confront Huber due to the trial court's rulings on the impeachment and hearsay objections. Defendant argues he should have been able at the very least to refresh Huber's recollection.

He cites to *United States v. Owens*, 484 US 554, 108 SCt 838, 98 LEd2d 951, for that proposition.

[¶39.]     In *Owens*, John Foster, a correctional officer was severely injured in a prison attack by Owens a prison inmate. 484 US at 556, 108 SCt at 840, 98 LEd2d 951. Shortly after the attack and while in the hospital, Foster was unable to remember his attacker due to a severe head injury that impaired his memory. *Id*. 108 SCt at 840-41, 98 LEd2d 951. Approximately three weeks after the attack, Foster was able to identify Owens as his assailant from a photo array and described the attack to investigators. *Id*., 108 SCt at 840, 98 LEd2d 951. At trial, Foster was able to testify that he clearly remembered telling investigators about the assault three weeks after he was injured and identifying Owens as his attacker from the photo array. *Id*. Foster also admitted at trial he could not remember actually seeing his attacker at the time he was assaulted. *Id*. Owens' defense counsel unsuccessfully tried to refresh Foster's recollection using hospital records in order to ask whether Foster remembered if any hospital visitors might have suggested Owens as the assailant, and whether he remembered, as was noted in his hospital records, that Foster had at one point attributed the assault to another person. *Id*. On appeal, Owens argued that the Constitution and the Federal Rules of Evidence prohibited the admission of Foster's out-of-court identification because Foster was unable to recall the basis of the identification due to his memory loss. *Id*. at 556, 108 SCt at 840, 98 LEd2d 951. Owens sought to have Foster's out-of-court identification excluded as a hearsay statement lacking any indicia of reliability or trustworthiness. *Id*. at 555, 108 SCt at 840, 98 LEd2d 951. The United States

Supreme Court held that the Confrontation Clause is satisfied by "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 559, 108 SCt at 842, 98 LEd2d 951. As such, the Confrontation Clause is satisfied "when a witness testifies as to his current belief but is unable to recollect the reason for that belief" and "the defendant has the opportunity to bring out such matters as the witness's bias, his lack of care and attentiveness, his poor eye sight, and even . . . the fact of a bad memory." *Id.* That Court further held that when a hearsay witness is available at trial and is subjected to unrestricted examination as to his faulty memory, the Confrontation Clause does not require additional examination under the hearsay rule for "indicia of reliability," or "particularized guarantees of trustworthiness" before the out-of-court statement can be admitted. *Id.* at 560, 108 SCt at 843, 98 LEd2d 951.

[¶40.] In the instant case, Defendant asks this Court to admit an out-of-court statement made by Huber, which she could not recall having made to either Rohlf or Defendant's private investigator, in order to impeach her in-court testimony. Defendant attempts to use the rule in *Owens* to force Huber to adopt a hearsay statement which she did not recall making and admit that statement at trial through a different witness, Rohlf. *Owens* does not provide support for Defendant's proposition. Even if this Court were to agree with Defendant that the trial court should have allowed Defendant to refresh Huber's memory with Rohlf's report, Defendant never requested the opportunity to do so with Huber on the stand.

Defendant used the report to refresh Rohlf's recollection and then attempted to introduce Huber's statement through Rohlf.

[¶41.]    The fact that the trial court did not allow Defendant to introduce Huber's out-of-court statements to Rohlf or to Defendant's private investigator did not hamper Defendant's ability to cross-examine Huber's faulty memory and her testimony that she did not see Defendant kick the victim. Defendant did not attempt to refresh Huber's memory after his first and second failed attempts to get the statements in through Huber. Defendant then placed himself in a double hearsay situation with Rohlf on the stand and did not pursue any other means of introducing the evidence. No relevant authority has been offered by Defendant to suggest the trial court erred.

[¶42.]    **2.    Whether the evidence was sufficient to sustain the verdict of guilty to the charge of aggravated assault.**

[¶43.]    Defendant argues that the testimony of Huber, Orin, and Jeffery cannot be reconciled, as none of the three witnesses ever told anyone prior to trial that Defendant had assaulted Scott. Defendant also points to the plea agreements reached between the State and Orin and Jeffery as further evidence that shows their testimony could not support a verdict of guilty.

[¶44.]    This Court's standard of review of an appeal based on the sufficiency of the evidence is "whether there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt." *Shaw*, 2005 SD 105, ¶19, 705 NW2d at 626 (quoting State v. Buchholz, 1999 SD 110, ¶33, 598 NW2d 899, 905). "On review, we accept the evidence and the most favorable inferences that can be fairly drawn from it that support the verdict." *Id*. We do not

resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence on appeal. *Id.* If the evidence including circumstantial evidence and reasonable inferences drawn therefrom sustain a reasonable theory of guilt, a guilty verdict will not be set aside. *Id.*

[¶45.] A conviction may be supported by circumstantial evidence even when all the elements of the crime are established circumstantially. *Id.* ¶45, 705 NW2d at 633 (citing State v. Guthrie, 2001 SD 61, ¶48, 627 NW2d 401, 421). "The State is not required 'to exclude every hypothesis of innocence' in order to support a conviction based on circumstantial evidence." *Id.* On review, this Court examines the evidence as a whole "to see whether in its totality it is enough to rule out any reasonable hypothesis of innocence." *Id.* (citing *Guthrie*, 2001 SD 61, ¶48, 627 NW2d at 421 (citing State v. Hage, 532 NW2d 406, 411 (SD 1995))).

[¶46.] Defendant argues that because the testimony of Huber, Orin, and Jeffery cannot be reconciled, the only possible conclusion that could be drawn from the evidence presented at trial was that Defendant was at the scene but did not participate in the assault. If this Court were to completely disregard the testimony of these three witnesses because it was not internally consistent and conflicts in the evidence existed, we would be acting well outside the standard of review we set forth above. We must review the testimony of these witnesses as presented without passing judgment on their credibility, or reweighing the evidence.

[¶47.] Three witnesses, Orin, Jeffery, and Bobbi, testified that Defendant ran toward Scott, Rosander, Ollerich, and Huber in an effort to chase them down and confront them in some fashion. This evidence placed Defendant at the scene and

engaged in conduct that suggested he was eager to participate in a fight with the "cowboys." This evidence was not disputed at trial and in fact was conceded by Defendant during his interview at the police station.

[¶48.]     In addition, Huber testified that Defendant was the most aggressive of the group in hurting Scott during the assault. Orin and Jeffery also testified that Defendant's conduct was the most aggressive in that Defendant's effort to hurt Scott far exceeded what anyone else did.

[¶49.]     Huber's testimony was in conflict with Orin's and Jeffery's as to how Defendant assaulted Scott, specifically as to whether Defendant kicked versus hit Scott. In addition, her credibility, memory, and ability to see clearly what transpired 100 feet ahead of her in the dark with only a street light to illuminate the scene was explored during cross-examination. Despite any inconsistency in Huber's testimony and the distance and lighting, the jury appears to have found her to be a credible witness.

[¶50.]     Orin's and Jeffery's motivation to pin the crime on Defendant was also thoroughly explored at trial. The Defendant attempted to show that Jeffery was motivated to fabricate testimony against Defendant at trial and place some of the blame on Defendant in order to reduce his share of the restitution owed to Scott. He then attempted to show Orin was motivated to lie in order to help his brother because at that time it was uncertain whether Orin would be subject to paying restitution to Scott after entering his guilty plea to simple assault for his conduct toward Rosander. The restitution amounted to almost $29,000. The jury appears to have considered and rejected Defendant's theory that Jeffery was motivated to lie

about Defendant's conduct in order to obtain a reduced share of the restitution or that Orin was lying in order to help his brother reduce his share of the restitution.

[¶51.]     There was evidence in the record that, if believed by the jury, sustained a verdict of guilty beyond a reasonable doubt and permitted the jury to reject Defendant's theory of defense that he was just an innocent bystander who ran to the scene of a fight and then stood idly by while all his cohorts participated in some manner.  While the testimony of the witnesses was not in perfect accord, we have never required such a standard in order to support a conviction on review.  There was sufficient evidence in the record from which the jury could find that Defendant kicked Scott in the head several times and caused serious bodily injury in a manner that showed an extreme indifference to the value of human life.

[¶52.]     **3.     Whether the trial court erred when it instructed the jury on aiding and abetting.**

[¶53.]     Defendant's final issue on appeal is that the instruction for aiding and abetting should not have been given to the jury.  Defendant argues that the evidence submitted at trial left the jury with only two options:  (1) that Defendant participated in the assault, which warranted conviction as an actual participant, or (2) in the alternative, that Defendant merely stood by as the assault happened and had no role in it, was not an aider or abetter, and should have been acquitted.  Defendant argues that there was no evidence in the record to suggest he acted as an aider or abetter, and, therefore, it was error to give the instruction.

[¶54.] We review a trial court's decision to grant or deny a particular jury instruction under the abuse of discretion standard of review.[7] State v. Cottier, 2008 SD 79, ¶7, 755 NW2d 120, 125 (quoting State v. Packed, 2007 SD 75, ¶17, 736 NW2d 851, 856). As long as competent evidence exists in the record to support a particular theory of the case, an instruction is warranted.[8] State v. Owen, 2007 SD 21, ¶32, 729 NW2d 356, 367 (citing State v. Bruder, 2004 SD 12, ¶8, 676 NW2d 112, 115) (holding that a criminal defendant is entitled to a requested jury instruction on the theory of his or her case if there is evidence at trial that supports that theory). Furthermore, "[g]enerally, 'a trial court is not required to instruct on matters that find no support in the evidence.'" State v. Mulligan, 2007 SD 67, ¶43, 736 NW2d 808, 822 (quoting State v. Kafka, 264 NW2d 702, 703 (SD 1978)).

[¶55.] Jury instruction Number 18 stated:

> The mere presence alone of the defendant at the scene of a crime is not sufficient to make that person an aider and abetter. It makes no difference that one present remained silent, or even acquiesced in the commission of the offense, or even mentally approved of the act.

---

7. Defendant argued in his brief that a trial court's decision on how to instruct a jury is reviewed on appeal for reversible error. Defendant cited to *State v. Menard*, 424 NW2d 382, 384 (SD 1988) in support of his proposition. This Court's statement in *Menard* that it was not reversible error to give a flight instruction in that criminal case was not a reference to the standard of review but rather to whether the trial court in that case erred.

8. The State cites to an Iowa Supreme Court case, *State v. Hogrefe*, 557 NW2d 871, 876 (Iowa 1996) in support of its proposition that this Court must view the evidence in a light most favorable to the party requesting the instructions. However, this Court has not adopted this as part of the test as to whether a trial court abused its discretion when granting or denying a particular jury instruction.

> The presence of a defendant at the scene of a crime is a circumstance which the jury can consider with all of the other facts and circumstances in the case.
>
> The presence of an accused at the scene of a crime, together with evidence of companionship and conduct before and after the offense is committed, may warrant an inference of guilt.

[¶56.] This Court has previously stated that "a party's presence at the scene of the crime is one circumstance which tends to support a finding that he was a participant[,] which, along with other circumstantial evidence, can establish his guilt as an aider and abetter." State v. Brings Plenty, 490 NW2d 261, 267-68 (SD 1992) (citing State v. Ashker, 412 NW2d 97 (SD 1987)). A defendant is more than a bystander if he knowingly did something to assist in the commission of a crime, which changes his status to that of an aider and abetter. *Id.* (citing State v. Schafer, 297 NW2d 473, 476 (SD 1980)). In order to obtain a conviction under an aider and abetter theory, the State must prove beyond a reasonable doubt that the defendant "acted with intent to promote or facilitate the commission of the crime, by aiding, abetting or advising another person in planning or committing the crime alleged to have been committed." *Id.* (citing SDCL 22-3-3).

[¶57.] Bobbi's testimony placed Defendant in the group of party goers who pursued the "cowboys" with the intent of catching up with them and making them account for the fire they supposedly set in the backyard at the house party. Her testimony placed Defendant in the front of the pack leading the way with Rodriguez to where the assault occurred. There was also evidence presented at trial that Defendant was at the scene of the crime at the time the assault was committed, which Defendant admitted to Rohlf. This was also confirmed by the testimony of

Huber, Orin, and Jeffery. Furthermore, Orin and Jeffery testified that Defendant participated in the physical assault on Scott. Defendant placed himself in the company of Orin and Jeffery after the assault at Jeffery's house and on the way to and from the convenience store. This evidence supported the State's aiding and abetting theory by showing that Defendant promoted or facilitated the crime by taking the lead in tracking down the victims. Defendant's admitted presence at the crime scene also supported the State's alternate theory that Defendant aided and abetted in the commission of the assault.

[¶58.] Affirmed.

[¶59.] KONENKAMP, ZINTER, MEIERHENRY, and SEVERSON, Justices, concur.