#29874-a-PJD
**2022 S.D. 69**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

   v.

BENJAMIN MCDERMOTT,                       Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
CLAY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE TAMI BERN
Judge

* * * *

NICOLE J. LAUGHLIN
Sioux Falls, South Dakota                 Attorney for defendant
                                          and appellant.


MARK VARGO
Attorney General

JACOB R. DEMPSEY
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
                                          and appellee.

* * * *

CONSIDERED ON BRIEFS
OCTOBER 3, 2022
OPINION FILED **11/16/22**

#29874

DEVANEY, Justice

[¶1.] Defendant appeals his jury conviction of third-degree rape. He contends that the evidence was insufficient to sustain the conviction because "[t]he DNA evidence raised significant doubt that penetration could have occurred." He thus requests that this Court reverse the circuit court's denial of his motion for judgment of acquittal. Because there is sufficient evidence in the record, including the testimony from the victim and the doctor that examined her after the rape, we affirm.

### Factual and Procedural Background

[¶2.] On October 29, 2020, J.O. and her sister decided to go to a bar in downtown Vermillion. At the time, they were living in separate, but adjacent, dormitories at the University of South Dakota. Their respective roommates decided to join them, and they traveled together to the Charcoal Lounge. Shortly after arriving, J.O.'s sister decided to leave because she did not feel well. She told the girls to call her when they needed a ride home. While at the bar, J.O. consumed a number of alcoholic beverages, and when the bar closed at 2:00 a.m., J.O. called her sister for a ride home.

[¶3.] After being picked up by J.O.'s sister, the girls decided to get food via the drive-through at McDonald's. A white pickup was ahead of their vehicle in the drive-through line, and one of the girls recognized the male occupants from talking to them outside the bar. Benjamin McDermott and his friend Cory were in the bed of the pickup. They had come from Sioux City to visit a group of friends at an apartment in Vermillion and ended up at the Charcoal Lounge at the same time as

-1-

J.O. and her friends. While one of the girls was talking to other occupants in the pickup, McDermott and Cory got out, walked to the girls' car, and began talking to them. When the vehicles in the drive-through line began moving, J.O.'s sister told the boys to either move out of the way or get into her vehicle. They both climbed into the backseat of the car. McDermott sat next to J.O., and they began flirting. According to J.O., McDermott repeatedly commented that the two of them were on a date. He shared his McDonald's order with her, and she reciprocated by feeding him fries.

[¶4.]      While McDermott and Cory were inside the girls' vehicle, the white pickup left without them. The boys, having lost their ride, indicated that they needed a place to spend the night, and J.O. and her roommate invited them to sleep in their dorm room. J.O.'s sister dropped J.O., her roommate, and the boys off, and after they entered the dorm room, the group began to get ready for bed. J.O. changed into a t-shirt and shorts, telling the boys not to look while she changed. The dorm room had a set of bunkbeds and a futon alongside the bottom bunk. J.O. opened the futon into a bed position where Cory slept. She testified that she asked McDermott to sleep on the futon with Cory, or on the floor, but he kept saying that he would sleep in the bed with her. After he kept asking, J.O. agreed to let him sleep in her bed. Before McDermott climbed into bed with J.O., he took off his shirt and pants but left on his boxers. McDermott turned off the dorm room lights, and J.O. turned on a fan.

[¶5.]      The group did not fall asleep right away. J.O.'s roommate was on her phone texting her boyfriend, and Cory was on his phone browsing social media.

They both testified that the fan was loud, and they did not hear anything happening. At some point, McDermott kissed J.O. She testified that she was okay with him kissing her and that she kissed him back. They continued kissing, and McDermott put his hands on her stomach and then moved his hands underneath her clothes. When he tried to move his hand lower, she told him no and that she "had a tampon in." She testified that he did not stop right away, but after she turned and faced the wall and told him she wanted to go to sleep, he stopped touching her. J.O. eventually fell asleep.

[¶6.] The next thing J.O. remembered was waking up with McDermott's penis inside her vagina. She was lying on her left side and he was lying on his left side behind her with his body against her. Her shirt was lifted, and her shorts and underwear were around her thighs. She was scared and confused and wanted it to stop. She told McDermott to stop, but she did not recall if he said anything to her in response. She then felt him kissing her neck, and while he was doing so, he gave her a hickey. She explained that she rolled onto her back so that he would stop. He then grabbed her hand and placed it on his penis and moved her hand up and down. She pulled her hand away. During all of this, she was telling him to stop. He finally did.

[¶7.] J.O. testified that after lying in the bed awake trying to forget about what had happened, she realized she could not, so she grabbed her phone, quietly got out of bed, and went to the bathroom. While in the bathroom, she could not locate her tampon inside her vagina and did not know if it had been taken out or if it was still inside of her. J.O. then called her sister and told her that she had been

raped. Her sister told her to come to her room in the adjacent dormitory. By this time, it was approximately 4:30 a.m. From there, the two contacted the University Police Department, who then contacted law enforcement.

[¶8.] Detective Robin Hower responded, and after obtaining information from J.O. about the incident, he directed J.O. to go to the hospital for a sexual assault examination. During the exam, hospital staff interviewed her and collected oral, vaginal-cervical, and anal swabs. They also swabbed the hickey on her neck and collected her underwear for testing. During the examination, Dr. Ray Mortinsen observed that J.O.'s tampon was shoved, along with its attached string, against her cervix at the end of the vaginal canal. He had to use forceps to remove it. The tampon and her clothing were collected as evidence, and the swabs were sent to the State Forensic Laboratory for DNA testing.

[¶9.] While J.O. was at the hospital, Detective Hower, Sergeant Armando Barash, and Bryant Jackson from the University Police Department went to J.O.'s dorm room. They entered the room and found Cory asleep on the futon and McDermott asleep on the bottom bunk. They observed that Cory was fully clothed, and McDermott was topless with a bedsheet over his lower half. They woke the boys and told them to get dressed while the officers waited outside. Cory came out of the room first, and because it took a while for McDermott to come out, Detective Hower reentered. He told McDermott that a sexual assault had been reported against him. McDermott later claimed that he was startled and confused by the accusation.

[¶10.]      Jackson first interviewed McDermott, and when he began questioning him about the previous evening's events, McDermott asked to use the bathroom. Because of the nature of the accusation, Jackson requested to see McDermott's genitals before he used the bathroom. McDermott consented, and Jackson did not see anything out of the ordinary during his inspection. After Detective Hower searched the dorm room, he interviewed McDermott. McDermott denied having sex with J.O.; however, he admitted that he had rubbed J.O.'s vaginal area. He claimed that he stopped when she said she was menstruating. He consented to a penile swab, and Detective Hower collected two swabs and had them sent to the State Forensic Laboratory for DNA testing.

[¶11.]      On December 15, 2020, McDermott was indicted on one count of third-degree rape in violation of SDCL 22-22-1(3), alleging he committed an act of sexual penetration with a person "incapable, because of physical or mental incapacity, of giving consent to such act[.]" During a three-day jury trial in June 2021, multiple witnesses testified for the State, including J.O., her sister, their roommates, and Cory. The State also presented testimony from Detective Hower, Dr. Mortinsen, and Molly Raber, a DNA analyst from the State Forensic Laboratory.

[¶12.]      Raber testified that she produced four reports as part of her testing of the evidence in this case. The reports were admitted as exhibits. She also explained the methods she used for DNA testing, including autosomal short tandem repeat (STR) testing and Y chromosome short tandem (Y-STR) testing that targets male DNA. She also testified that she conducted serology testing. She then explained the results she obtained for each swab or sample she tested.

[¶13.]     According to Raber, J.O.'s vaginal-cervical swab tested positive for the presence of male DNA, but there was not enough DNA for her to obtain an STR or Y-STR profile to make a comparison to any individual. She was not able to obtain sufficient DNA from the tampon to conduct either STR or Y-STR testing. However, through serology testing, she was able to identify the presence of seminal fluid on the tampon. The serology testing on the tampon did not reveal the presence of sperm cells in the seminal fluid. Raber explained that the lack of sperm cells indicates that the fluid on the tampon was pre-ejaculate.

[¶14.]     Raber's STR testing on J.O.'s anal swab indicated the presence of male DNA, along with J.O.'s DNA. She was able to obtain a partial Y-STR profile, which was consistent with McDermott's DNA. She opined that the presence of McDermott's DNA could have resulted from his penis rubbing J.O.'s anus when he penetrated her vaginally from behind. Through STR testing on J.O.'s neck swab, Raber determined that the major contributor matched McDermott's DNA profile, while J.O. was the minor contributor. Raber also obtained a Y-STR profile from J.O.'s oral swab and determined that it was consistent with McDermott's profile.

[¶15.]     STR testing of the cutting from J.O.'s underwear revealed a mixture of DNA with the major contributor being J.O., but there was insufficient DNA to make further comparisons to determine the source of the minor contributor. However, Raber was able to obtain a Y-STR profile, which indicated the presence of DNA from two males. She testified that the Y-STR profile for the major contributor was consistent with McDermott's profile. She explained that the minor contributor to the Y-STR profile could be a second male, or it might have been an artifact from the

type of testing conducted. She further explained that DNA can be transferred onto clothing in washing machines or from others handling the clothing.

[¶16.] Raber's STR testing on McDermott's penile swab revealed a mixture of DNA from two individuals. The DNA profile of the major contributor matched J.O.'s DNA profile, while the DNA profile of minor contributor was consistent with McDermott's DNA. When asked about the significance of J.O. being the major contributor and McDermott being the minor contributor, Raber explained that this result made it more likely that J.O.'s DNA was from a bodily fluid, rather than from touch DNA. Raber then conducted serology testing on the penile swab in an attempt to identify what type of fluid might be present. The forensic laboratory does not currently have the ability to determine through serology testing whether a swab contains vaginal secretions, but it can test for the presence of blood or saliva, neither of which were detected on McDermott's penile swab. Raber thus opined that the DNA and serology test results were consistent with vaginal-penile penetration.

[¶17.] At the close of the State's case, McDermott moved for judgment of acquittal. In denying the motion, the circuit court explained that J.O.'s "testimony in and of itself establishes a prima facie case for every element of the offense." The court further noted that J.O.'s testimony is corroborated by the testimony of Dr. Mortinsen and Raber.

[¶18.] McDermott testified in his defense. His version of the events leading up to the boys joining the girls in J.O.'s dorm was consistent with the testimony provided by others. Although he agreed with J.O.'s testimony that the two began

kissing after they entered the bottom bunk, he testified that their kissing and touching led to his boxers and her shorts being lowered. He also claimed that J.O.'s hand was on his penis and his hand was on her vaginal area and they were "kissing and rubbing." According to McDermott, J.O. then told him that she was menstruating, and he said he was not "really into that." He claimed that he pulled his boxers back up and they continued kissing for about five minutes before going to sleep. McDermott testified that although he had multiple drinks over the course of a few hours, he "was coherent" and "knew what was going on." After he and J.O. fell asleep, the next thing he recalled was law enforcement in the room telling him that he had been accused of sexually assaulting J.O.

[¶19.] The jury found McDermott guilty of third-degree rape, and the circuit court sentenced him to ten years in prison with eight years suspended. McDermott appeals, asserting that the circuit court erred in denying his motion for judgment of acquittal.

**Analysis and Decision**

[¶20.] McDermott notes that an essential element of third-degree rape under SDCL 22-22-1(3) is penetration. He further acknowledges that penetration is defined to include "an act, however slight, of sexual intercourse . . . into the genital . . . opening[] of another person's body." SDCL 22-22-2. McDermott argues, however, that the evidence at trial was insufficient to support his conviction because the element of penetration could not be proven beyond a reasonable doubt. In particular, he claims that the DNA "evidence only proves that [his] DNA profile was on [J.O.'s] neck, underwear, and mouth," not in her vagina. He further asserts

that "the theory that [he] was able to not only penetrate her vagina, but also push her tampon so deep inside of her with his penis that it was unreachable, without any blood being transferred onto him or his DNA being transferred to the vagina or tampon is improbable" and raises "significant reasonable doubt that vaginal penetration occurred."

[¶21.] "[A] motion for judgment of acquittal attacks the sufficiency of the evidence[.]" *State v. Ahmed*, 2022 S.D. 20, ¶ 14, 973 N.W.2d 217, 221 (alteration in original) (citation omitted). Our standard of review on a sufficiency of the evidence claim is well established.

> "A question regarding the sufficiency of the evidence to sustain a conviction is reviewed de novo." *State v. McReynolds*, 2020 S.D. 65, ¶ 11, 951 N.W.2d 809, 814. When reviewing the sufficiency of the evidence, the Court considers "[w]hether there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt." *State v. Wolf*, 2020 S.D. 15, ¶ 13, 941 N.W.2d 216, 220 (citation omitted). On review, the Court "accept[s] the evidence and the most favorable inferences that can be fairly drawn from it that support the verdict." *Id.* (quoting *State v. Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d 329, 342). This Court does not "resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence on appeal. If the evidence including circumstantial evidence and reasonable inferences drawn therefrom sustain a reasonable theory of guilt, a guilty verdict will not be set aside." *Id.* (quoting *Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d at 342).

*State v. Krouse*, 2022 S.D. 54, ¶ 34, 980 N.W.2d 237, 247 (quoting *Ahmed*, 2022 S.D. 20, ¶ 14, 973 N.W.2d at 221).

[¶22.] While McDermott quotes the above standard of review, his argument on appeal focuses almost exclusively on his view that "[t]he DNA results do not prove beyond a reasonable doubt that actual penetration occurred as required by

SDCL 22-22-1(3)." But the State was not limited to proving vaginal penetration through DNA evidence. As the circuit court aptly noted, J.O.'s testimony alone would be sufficient to prove the elements of third-degree rape under SDCL 22-22-1(3), including penetration.

[¶23.]     Under SDCL 22-22-1(3), "[r]ape is an act of sexual penetration accomplished with any person . . . incapable, because of physical or mental incapacity, of giving consent to such act[.]" "Sexual penetration" is defined in SDCL 22-22-2 as "an act, however slight, of sexual intercourse, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the body or of any object into the genital or anal openings of another person's body."

[¶24.]     Here, the jury heard evidence indicating consensual sexual activity between J.O. and McDermott that did not include penetration. The jury also heard testimony from J.O. that during this consensual activity, she asked him to stop and he did not stop right away. More critically, yet ignored by McDermott in his arguments on appeal, J.O. specifically testified that after McDermott eventually stopped and she fell asleep, she woke to find his penis inside her vagina and her shorts and underwear down to her thighs. She testified that she asked him to stop, but he did not. As Raber testified, the evidence of J.O. being the major contributor to the DNA on McDermott's penile swab, most likely from J.O.'s bodily fluids, is consistent with J.O.'s description of vaginal-penile penetration. Her further determinations that the Y-STR profiles obtained from J.O.'s anal swab and from J.O.'s underwear were consistent with McDermott's DNA also supported the jury's verdict.

[¶25.] In addition, the jury heard J.O.'s testimony about her inability to locate the tampon inside her vagina after these events. Dr. Mortinsen testified that during his pelvic exam of J.O., he could not locate J.O.'s tampon when he initially inserted a speculum inside J.O.'s vaginal canal. When he eventually located the tampon, he noted its string and the tampon itself were both pressed up against the cervix at the end of the vaginal canal and he had to use forceps to remove it. He agreed these findings were consistent with the tampon being pressed up "there by a penis entering the vagina." Moreover, the serology testing identified seminal fluid on both the tampon and the vaginal-cervical swab, and there was no evidence in the record suggesting that J.O. had sexual contact with anyone other than McDermott on the night in question.

[¶26.] While McDermott offers an alternative explanation for why the DNA and serology results could be consistent with his version of the events in question and contends that these results support the existence of reasonable doubt, "[t]his Court will not resolve conflicts in the evidence, assess the credibility of witnesses, or evaluate the weight of the evidence." *See State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83 (citation omitted). Rather, "[t]he jury is the exclusive judge of the credibility of witnesses" and determines the weight to be accorded to the evidence presented. *State v. Thoman*, 2021 S.D. 10, ¶ 37, 955 N.W.2d 759, 771 (citation omitted). This includes an assessment of the credibility of both J.O.'s and McDermott's testimony, as well as the DNA evidence. As this Court has explained, "the relevant question is not whether certain evidence was absent from trial; the relevant question is whether 'there is evidence in the record which, if believed by

the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt.'"

*State v. Hayes*, 2014 S.D. 72, ¶ 41, 855 N.W.2d 668, 680 (quoting *State v. Hauge*, 2013 S.D. 26, ¶ 12, 829 N.W.2d 145, 149). Because there is sufficient evidence in the record to support the jury's verdict finding McDermott guilty of third-degree rape, the circuit court did not err in denying his motion for judgment of acquittal.

[¶27.]       Affirmed.

[¶28.]       JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur.