2005 SD 17

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Lance M. SWALVE, Defendant and Appellant.**

**No. 23210.**

Supreme Court of South Dakota.

Argued Jan. 11, 2005.

Decided Feb. 2, 2005.

Lawrence E. Long, Attorney General, Grant E. Gormley, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

Philip R. Parent of Arneson, Issenhuth & Parent, L.L.P., Madison, South Dakota, Attorney for defendant and appellant.

SABERS, Justice.

[¶ 1.] Lance Swalve (Swalve) operated two auto dealerships in South Dakota. Swalve was charged and convicted of numerous counts of grand theft and failure to deliver title. Swalve appeals and we affirm.

### Facts

[¶ 2.] Swalve operated two auto dealerships in Watertown and Arlington: Kneips of Watertown and Kneips GMC. When purchasing vehicles from these businesses, customers would commonly trade-in vehicles that had outstanding liens on them and would also purchase extended warranties, also referred to as "service contracts," on the "new" vehicles. It was then the dealerships' responsibility to pay off the outstanding liens on the trade-in vehicles and forward the extended warranty contracts to the warranty company.

[¶ 3.] In the later part of 2002, local law enforcement and the South Dakota Division of Motor Vehicles received a number of complaints alleging: (1) the auto dealerships failed to pay off the outstand-

ing liens on trade-in vehicles, (2) the dealerships failed to purchase extended warranties on behalf of their customers, and (3) Certificates of Title to the newly purchased vehicles were not provided to the buyers. An investigation ensued and ultimately concluded with Swalve surrendering his dealer license on November 22, 2002.

[¶ 4.] On May 5, 2003, Swalve was charged by Complaint with seventy-seven counts of grand theft and failure to deliver title. Following a jury trial, Swalve was found guilty of twenty-one counts of grand theft and thirty counts of failure to deliver title.

### Standard of Review

[¶ 5.] In determining whether a trial court erred in denying a defendant's motion for judgment of acquittal, "[o]ur inquiry is whether the State set forward sufficient evidence from which the finder of fact could reasonably find the defendant guilty." *State v. Boston*, 2003 SD 71, ¶ 6, 665 N.W.2d 100, 103 (citing *State v. Gonzalez*, 2001 SD 47, ¶ 7, 624 N.W.2d 836, 838). "A guilty verdict will not be set aside if the state's evidence and all favorable inferences that can be drawn therefrom support a rational theory of guilt." *State v. Phair*, 2004 SD 88, ¶ 16, 684

N.W.2d 660, 665 (quoting *State v. Downing*, 2002 SD 148, ¶ 22, 654 N.W.2d 793, 800).

[¶ 6.] **1. Whether the trial court erred in failing to grant a motion for judgment of acquittal on charges of grand theft by deception in creating a false impression as to title status and the ability to provide clear title.**

[¶ 7.] Swalve was convicted of the following counts of Grand Theft by Deception: 17, 49, 54 and 60. The jury determined that Swalve deceived his customers by creating a false impression as to the title status and the ability to provide clear title.

[¶ 8.] The record shows that the vehicles in question were taken in by the dealerships as trade-ins. Each of these vehicles had outstanding liens which were supposed to be paid off by the dealership. But, in each of these instances, the vehicles were re-sold before the prior liens were paid off.[1]

[¶ 9.] Swalve correctly states that in the crime of Theft by Deception, there must exist in the mind of the perpetrator the specific intent to defraud at the time the property was received.[2] He contends that since he was not the primary salesperson in each of these instances the State

---

1. Ryan Easthouse, one of the salespersons for Kneip's of Watertown, testified that when a customer traded-in a vehicle with an outstanding lien it was the dealerships' responsibility to pay off the lien. Easthouse stated that this was usually done within 7–10 days after the trade-in vehicle was received. However, in each of these instances, more than 30 days passed between the time when the vehicle was traded-in and when it was resold with the outstanding lien still on the vehicle.

2. SDCL 22–30A–3 provides in relevant part:
Any person who obtains property of another by deception is guilty of theft. A person deceives if with intent to defraud he:
(1) Creates or reinforces a false impression, including false impressions as to law, value,

intention, or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;
. . .
(4) Fails to disclose a known lien, adverse claim, or other legal impediment to the enjoyment of property which he transfers or encumbers in consideration for property he obtains, whether such impediment is or is not valid, is or is not a matter of official record.
The term "deceive" does not, however, include falsity as to matters having no pecuniary significance, or puffing by statements unlikely to deceive reasonable persons.

failed to offer any evidence of the requisite intent to defraud at the time the transaction was conducted. However, both Ryan Easthouse and Laurie Bleeker, two former employees, testified that it was Swalve himself who determined which lien pay offs on trade-in vehicles would be made and when they would be made. Additionally, Easthouse testified that regardless of which salesperson was involved, Swalve was the ultimate authority on any sale. It can be reasonably inferred from this evidence that Swalve knew that he did not have clear title to these trade-in vehicles when they were re-sold due to the fact that he had not yet paid off the outstanding liens on the vehicles.

[¶ 10.] Based on the above, the record discloses sufficient evidence to support the jury's finding that Swalve intended to defraud these customers at the time the trade-in vehicles with outstanding liens were resold to them. Therefore, it has not been shown that the trial court erred in denying Swalve's motion for judgment of acquittal on Counts 17, 49, 54 and 60. We affirm Issue 1.

[¶ 11.] **2. Whether the trial court erred in failing to grant a motion for judgment of acquittal on charges of grand theft by deception in creating a false impression as to the ability to pay off the outstanding liens on trade-in vehicles.**

[¶ 12.] Swalve was convicted of the following counts of Grand Theft by Deception: 32, 55, 55A, 57, 65 and 72. In these instances, the jury concluded that Swalve intended to deceive by creating a false impression as to the ability to pay off the

outstanding loans owed on trade-in vehicles.

[¶ 13.] The record shows that the vehicles involved in these counts were taken in by the two dealerships as trade-in vehicles. However, the dealership subsequently failed to pay-off the outstanding liens on the vehicles. As a result, the lien holders sought payment from the prior owners even though they no longer owned the vehicles.

■ [¶ 14.] Again, Swalve contends that he was not the salesperson in these particular transactions. Furthermore, Swalve gave money to two of the complaining customers so that payments could be made to the outstanding liens when the liens were not paid off in a timely manner.[3] Swalve argues that this indicates that he did not intend to defraud the customers at the time the trade-ins were made. Therefore, it is his contention that the State's evidence failed to prove intent to defraud on his part.

[¶ 15.] The testimony provided by the customers who traded-in these vehicles indicates that Swalve himself was involved to some extent in the trade-in deals pertaining to counts 32, 57, 65, and 72. The evidence also shows that Swalve personally signed the loan applications related to the deals involved in counts 55, 55A, and 72. Additionally, Ryan Easthouse and Laurie Bleeker, both testified that it was Swalve who determined which lien pay offs on trade-in vehicles would be made and when they would be made.

[¶ 16.] Concerning Swalve's contention that his partial payment of two outstanding liens indicates that he did not intend to

---

**3.** In regard to Count 32, the evidence shows that the dealership attempted to pay off the outstanding lien on the trade-in vehicle but the dealership's check was returned due to insufficient funds. In response to this, Swalve gave the customer $695 in cash so that she could make two loan payments which would have brought the account current at that time. In regard to Count 72, the evidence shows that Swalve made one monthly payment on the outstanding lien but then failed to pay off the balance.

defraud the customers at the time the trade-ins were made, we look to SDCL 22–30A–10.1 which provides:

> If a person, who has been accused of theft, restores or returns the property allegedly appropriated before an indictment or information is laid before a magistrate, such fact may be considered in mitigation of punishment. *The restoration or return of the property is not a defense nor may it be considered by the finder of fact.*

(emphasis added). This Court has held that "[t]he plain language of this statute clearly excludes evidence of restoration or repayment from being considered by the finder of fact in theft prosecutions. There are no exceptions." *Phair*, 2004 SD 88, ¶ 10, 684 N.W.2d at 664. Therefore, any evidence that Swalve may have made partial payments subsequent to his failure to fully pay off the outstanding liens in a timely manner cannot be considered.

■ [¶ 17.] Based on the above, the record discloses sufficient evidence to support the jury's finding that Swalve intended to defraud these customers when he failed to pay off the outstanding liens on the trade-in vehicles in a timely manner. Therefore, it has not been shown that the trial court erred in denying Swalve's motion for judgment of acquittal on Counts 32, 55, 55A, 57, 65 and 72. We affirm Issue 2.

[¶ 18.] **3. Whether the trial court erred in failing to grant a motion for judgment of acquittal on charges of grand theft by deception in creating a false impression that a vehicle warranty would be provided.**

[¶ 19.] It is common industry practice that when an auto dealer sells a vehicle, an extended warranty or "service contract" is offered to the customer through the dealer. CNA National Warranty Corporation (CNA) had an agreement with Kneips GMC where the dealership would offer CNA's extended warranties to their customers. CNA would set the wholesale price and Kneips GMC would set the retail price. The customer pays the retail price and the dealer remits the wholesale price to CNA. Pursuant to the agreement, Kneips GMC was to report sales of extended warranties and pay CNA for those contracts within ten days of the end of the month in which they were sold. In the three years that Kneips GMC had this arrangement with CNA over 200 extended warranties were sold. However, for several months in 2002, Swalve remitted no money to CNA for extended warranties that his dealership sold to customers. CNA was unaware that the extended warranties had been sold in its name and had not received any payment on these contracts up to the time of trial.

[¶ 20.] In Counts 36, 41, 44, 45 and 51, Swalve was convicted of Theft by Deception for creating a false impression to the customer that an extended warranty had been purchased on their behalf, when in fact it had not.[4] Swalve now argues that the trial court should have granted his judgment of acquittal on these counts because there was no evidence that Swalve intended to defraud his customers at the time he collected monies for the extended warranties. He also points out that all of the individuals in these counts eventually received service contracts effective as of the date of sale.

[¶ 21.] The record shows that when a customer purchased an extended warranty along with a "new" vehicle, the financing

---

4. Swalve was also charged with identical counts of Theft by Deception relating to extended warranty contracts in Counts 28, 56 and 61, but the jury acquitted him of those counts.

for the purchase would include payment for the "new" vehicle, payment for any outstanding liens on the trade-in vehicle (if applicable), and payment for the extended warranty. In other words, payment for the extended warranty was factored into the financing agreement for the newly purchased vehicle. Laurie Bleeker testified that these payments were deposited into the dealership's account. She would then prepare the checks that were to be remitted to CNA each month for the extended warranties that were sold in the preceding month; however, they would not be sent until Swalve instructed her to do so.[5] Therefore, even though the dealership had already been paid the full retail price for the extended warranties, Swalve chose not to remit those funds to CNA.

[¶ 22.] It should be noted that regardless of Swalve's failure to remit the documentation and payment for the extended warranties that were sold to these customers, CNA honored the contracts. Rick Jones, a senior vice-president of CNA, testified that the company chose to honor the extended warranties in the interest of customer relations even though they had not received payment for those contracts.

[¶ 23.] Based on the above, the record discloses sufficient evidence to support the jury's finding that Swalve intended to defraud his customers when he failed

to remit payment to CNA for the extended warranties purchased through the dealership. Therefore, it has not been shown that the trial court erred in denying Swalve's motion for judgment of acquittal on Counts 36, 41, 44, 45 and 51. We affirm Issue 3.

[¶ 24.] 4. **Whether the trial court erred in failing to grant a motion for judgment of acquittal on charges of failure to deliver title pursuant to SDCL 32-3-7.**

[¶ 25.] Swalve appeals the convictions of twenty-one counts of failure to deliver title. SDCL 32-3-7 provides, in pertinent part, as follows:

Any person, upon the sale and delivery of any used or secondhand motor vehicle, shall within thirty days thereof deliver to the purchaser a certificate of title, endorsed according to law, and issued for the vehicle by the department. . . . A violation of this section is a Class 2 misdemeanor.

[¶ 26.] During 2002, Swalve's dealerships sold a number of vehicles without providing certificate of title to the purchaser within the statutorily required thirty-day period. In some cases, the receipt of the title was late but in other cases the certificate of title was never delivered to the purchaser.

---

5. Laurie Bleeker's testimony regarding the CNA extended warranties was as follows:

Q: Again, having prepared the check, would you wait for the defendant's instruction to send it?
A: Yes.
Q: In September which contract would have been due? Not the specific ones. In September, the contracts from August would be due; correct?
A: Correct.
Q: Do you recall whether you prepared a sheet for August?
A: I probably prepared a sheet but I don't remember sending it off.

Q: For in October, did you prepare a sheet for September?
A: Yes.
Q: Do you remember sending it off?
A: No.
Q: In November, was there a sheet prepared for October?
A: Yes.
Q: Was it sent off?
A: No.
Q: Now was there any attempt or did you receive any instruction to contact CNA, or the customers that there was an issue with the delivery of that documentation to CNA?
A: No.

[¶ 27.] Swalve contends that he had a lawful excuse for failing to deliver title pursuant to SDCL ·32–3–7. He claims that Pioneer Garage (Pioneer) of Highmore, South Dakota, unlawfully withheld vehicle titles making it impossible for Swalve to deliver the titles to his customers. This stems from an arrangement that Swalve had with Pioneer in which Swalve's dealerships would sell vehicles owned by Pioneer. This is referred to as a "floor planning" arrangement. Under this arrangement, whenever Swalve ·sold one of Pioneer's vehicles, he would forward payment for the vehicle to Pioneer and in turn Pioneer would provide the title to Swalve so that it could be delivered to the customer. The record indicates that Swalve and Pioneer operated under this arrangement for approximately two years, during which time a number of Pioneer vehicles were sold by Swalve's dealerships and titles to those vehicles were delivered to the respective customers without incident. However, in the Spring of 2002, the relationship between Swalve and Pioneer began to sour. Jon Briggs, the collection manager for Pioneer, testified that Pioneer began to lose its trust in Swalve when some of the checks that were sent to Pioneer were returned due to insufficient funds. Furthermore, the management at Pioneer began to suspect that Swalve was not informing Pioneer of all the sales involving Pioneer-owned vehicles.[6] Because of this, Pioneer eventually refused to deliver any vehicle titles to Swalve in order to maintain their only security interest in the Pioneer vehicles that Swalve possessed.

[¶ 28.] Both the State and Swalve agree that SDCL 32–3–7 is a general intent crime, as opposed to a specific intent crime. Therefore, the State is only required to prove that Swalve committed the act of failure to deliver title without a lawful excuse and is not required to prove the act of omission plus a specific intent. *See State v. Taecker*, 2003 SD 43, ¶ 25, 661 N.W.2d 712, 718. In each of these counts, it is uncontested that Swalve failed to deliver the titles to the purchaser within thirty days. Therefore, the pertinent question is whether Swalve had a *lawful excuse* in failing to deliver the titles within thirty days.

[¶ 29.] The testimony of Jon Briggs, Laurie Bleeker, and Ryan Easthouse establishes that Swalve deliberately attempted to deceive Pioneer through the use of "customer appreciation days."[7] There-

---

6. The State contends that Pioneer learned of the clandestine sales when it discovered that Swalve was obtaining duplicate titles in order to avoid his arrangement with Pioneer. The State further contends that Swalve deliberately attempted to deceive Pioneer's inventory inspectors by establishing "customer appreciation days." When Swalve would receive notification of an upcoming inventory inspection, the dealerships would contact customers who had purchased Pioneer-owned vehicles and would offer to clean and wash the vehicles if they brought them back to the dealerships on a specified day. The State argues that this was done to deceive the Pioneer inventory inspectors into believing that those vehicles were still part of Swalve's inventory and had not been sold.

7. Ryan Easthouse's testimony regarding "customer appreciation days" is as follows:

Q: What is customer appreciation day?
A: That was—we had a few customers that were friends of the dealership and if we had an inspection, we would have them bring their cars in to be on the lot for the inspection.
Q: Now those wouldn't be just any cars; would they?
A: No.
Q: Why those particular cars?
A: They were on our floor plan list.
Q: And so they were on the list that Pioneer was coming to check?
A: Yes.

fore, it was Swalve's own fraudulent activity that led to the situation where Pioneer refused to turn over titles.

[¶ 30.] Based on the above, the record discloses sufficient evidence to support the jury's finding that Swalve failed to deliver vehicle titles to purchasers within thirty days, without legal excuse. Therefore, it has not been shown that the trial court erred in denying Swalve's motion for judgment of acquittal on these counts. We affirm Issue 4.

[¶ 31.] **5. Whether the trial court erred in failing to grant defendant's motion to suppress evidence.**

[¶ 32.] Subsequent to the investigation of Swalve in November and December of 2002, but prior to the filing of this complaint, three separate felony charges were lodged against Swalve in Codington County. On December 9, 2002, investigators obtained a search warrant and subsequently seized Swalve's business records from a trailer in his possession. As part of his defense to those charges, Swalve filed a motion to suppress the evidence that was obtained from the trailer. The trial court granted Swalve's motion to suppress holding that the affidavit in support of the search warrant did not establish probable cause and that the warrant was overbroad.

[¶ 33.] In the present case, Swalve filed a motion to suppress evidence pertaining to certain counts of the indictment because those counts were the product of the invalid search. After a hearing on the matter, the trial court suppressed the evidence as to Counts 5, 69 and 70, determining that

they "were developed through resort to the seized evidence." Therefore, by implication, the trial court also held that the evidence pertaining to the balance of the counts was *not* developed by resort to the seized evidence. Swalve argues that the trial court erred in failing to suppress the evidence as to the balance of the counts.

[¶ 34.] "A motion to suppress based on an alleged violation of a constitutionally protected right is a question of law reviewed de novo." *State v. Hodges,* 2001 SD 93, ¶ 8, 631 N.W.2d 206, 209 (citing *State v. Stanga,* 2000 SD 129, ¶ 8, 617 N.W.2d 486, 488). "The trial court's findings of fact are reviewed under the clearly erroneous standard of review, but the application of a legal standard to those facts is a question of law, which we review de novo." *State v. Cummings,* 2004 SD 56, ¶ 6, 679 N.W.2d 484, 486.

[¶ 35.] On November 21, 2002 and December 4, 2002, investigators met with Swalve and obtained information from him regarding: vehicle transactions in which title had not yet been transferred, vehicle transactions in which lien pay offs on trade-in vehicles had not been made, vehicles that had been sold without clear title, and vehicles in which extended warranties had been sold but the funds were not forwarded to the warranty company. The information was voluntarily provided through hand-written lists, purchase orders received from the dealerships, vehicle title records and information obtained from the DealerTracker system, and Pio-

---

Q: Well, if they are on the list, but they had been sold, why would they have come back in?

A: They were supposed to be paid off the list.

Q: What do you mean, they were supposed to be paid off the list?

A: We have to pay—pay Pioneer that amount of money that was floor planned to us for that vehicle after we sold it.

Q: So it was an attempt to keep the sale secret from Pioneer?

A: Yes.

Q: And did there come a time in late 2002, when [a] Pioneer inspection occurred and there were [a] significant number of vehicles missing?

A: Yes.

neer Garage of Highmore, South Dakota. Furthermore, on December 6, 2002, investigators made contact with a representative of CNA and requested information regarding CNA warranties sold by Swalve.

[¶ 36.] "The independent source doctrine applies when evidence is legally seized though a source independent of an illegal search." *State v. Boll*, 2002 SD 114, ¶ 23, 651 N.W.2d 710, 717 (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920)). The information gathered as a result of the investigators' meetings with Swalve and through CNA was all obtained *prior* to the issuance of the search warrant on December 9, 2002, and from sources independent of the illegally seized business records, as described above. Therefore, any of the information garnered from these sources that also happens to be contained in the suppressed business records would fall under the independent source doctrine exception to the exclusionary rule. *Id.*

[¶ 37.] Based on the above, it has not been shown that the trial court erred in failing to grant Swalve's motion to suppress evidence. We therefore affirm Issue 5.

[¶ 38.] **6. Whether the trial court erred in allowing an undisclosed witness to testify during the State's case-in-chief.**

[¶ 39.] Prior to trial, the trial court granted Swalve's discovery motion asking for the names and addresses of all witnesses the State intended to call in its case-in-chief and all individuals interviewed by the State in its investigation of the case. Pursuant to this order, the State provided a list of the persons involved in this case. Included on this list was Mike Schmidt (Schmidt) who worked for CNA. However, during the trial, the State instead called Rick Jones (Jones), a Senior Vice–President of CNA, to testify to the same or similar information. Swalve objected to Jones being called as he had not been disclosed to the defense. The trial court held that Swalve had known "for a considerable period of time" about a potential CNA witness and therefore allowed Jones to testify instead of Schmidt. Swalve argues that this was error.

[¶ 40.] In the case of nondisclosure of discoverable material, the trial court's choice of remedy or failure to grant a particular remedy is reviewed under an abuse of discretion standard. *State v. Sorenson*, 2000 SD 127, ¶ 6, 617 N.W.2d 146, 148. "We will not reverse a ruling reviewed under an abuse of discretion standard absent a showing of prejudice." *Id.* ¶ 10 (citing *State v. Daniel*, 2000 SD 18, ¶ 13, 606 N.W.2d 532, 535).

[¶ 41.] Here, Swalve argues that the trial court erred in allowing Jones to testify but makes no showing that he was prejudiced by Jones's testimony any more than he would have been through Schmidt's testimony. In fact, at oral argument, counsel conceded his client was not prejudiced on this point. As a result, it has not been shown that the trial court's ruling warrants reversal. We therefore affirm Issue 6.

[¶ 42.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and MEIERHENRY, Justices, concur.