#29711-a-PJD
**2022 S.D. 54**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,            Plaintiff and Appellee,

    v.

JACQUELINE KROUSE,            Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
LINCOLN COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JEROME A. ECKRICH III
Retired Judge

* * * *

SHAWN M. NICHOLS
CLAIRE E. WILKA of
Cadwell, Sanford, Deibert
   & Garry, LLP
Sioux Falls, South Dakota            Attorneys for defendant
                     and appellant.


MARK VARGO
Attorney General

STEPHEN G. GEMAR
Assistant Attorney General
Pierre, South Dakota            Attorneys for plaintiff
                     and appellee.

* * * *

ARGUED
APRIL 27, 2022
OPINION FILED **08/31/22**

#29711

DEVANEY, Justice

[¶1.] The defendant appeals her conviction, following a bench trial, of second-degree arson arising from a fire that occurred in her home for which she made a claim to her insurance company for damages and losses. The defendant asserts that this Court's review is confined to the circuit court's findings of fact; that the circuit court erred in denying her motion for judgment of acquittal; and that she was denied her fundamental right to due process and a fair trial. We affirm.

**Factual and Procedural Background**

[¶2.] On March 13, 2019, at approximately 11:00 p.m., Sioux Falls Fire and Rescue personnel responded to a 911 call reporting a home fire. Firefighters extinguished the fire; however, before being suppressed, the fire burned basement walls and continued upward, burning the dining room floor and causing significant smoke damage throughout several portions of the home. Sioux Falls Fire and Rescue Investigator Tyler Tjeerdsma, who was assigned to investigate the cause of the fire, arrived shortly after fire suppression efforts began and collected information from the firefighters on the scene. He also spoke with the owner of the home, Jacqueline Krouse, and her boyfriend, Steven Veenhof, who was present during the fire. Krouse told Tjeerdsma that she was having problems with a fireplace in the basement and that a breaker kept tripping. She claimed that she went in and out of the mechanical room where the breaker panel was located, and roughly five minutes after one of her trips into the room, she noticed a small fire on the floor. She told Tjeerdsma that she left the room to get a towel, wet it down, and

-1-

return to the room, but by the time she got back, the fire was too big to put out, so she went upstairs to call 911.

[¶3.]     After examining the evidence and collecting information, Tjeerdsma determined that the fire started in the mechanical room in the basement. He traced the point of origin to the east wall of the mechanical room by some charred cardboard boxes. However, he could not determine the cause of the fire. He wrote in his report that "[w]ithout the benefit of additional evidence or information the specific cause of the fire will remain undetermined." He further wrote that his analysis of the evidence and information "was sufficient to support that the fire was the result of an unintentional act" and that "no evidence or information was discovered that would support any deliberate act which would have caused this fire."

[¶4.]     The day after the fire, Krouse submitted a claim to her insurer, State Farm Insurance Company, seeking to recover for the damage to her home. Prior to the fire, Krouse's home was valued at over $1 million. At the time of the fire, she was self-employed as an artist and received $21,000 a month in alimony from her ex-husband. She was the only person living in the home full time. Krouse claimed that it was her plan to keep the home until her children graduated from high school, and with her son nearing graduation, she had started to prepare the home to be listed for sale.

[¶5.]     State Farm assigned claim representative Myra Olson to Krouse's insurance claim. Olson met with Krouse and Veenhof the same day Krouse submitted her claim. Olson testified that during the meeting, Krouse mentioned

that she had previously worked with Olson at State Farm approximately a year ago when Krouse worked as a State Farm insurance agent. Olson further testified that Krouse told her that her mother and sister work for State Farm and that her mother works in management of fire claims.

[¶6.] During the meeting, Krouse related to Olson a version of events leading up to the fire that differed in some respects from the version she provided to Tjeerdsma. Krouse told Olson that on the evening of March 13, she and Veenhof had gotten into an argument, after which she went to the basement. Krouse explained that she walked into a theater room in the basement to inspect a recently completed paint job. Krouse stated that she noticed about an inch of water on the floor in the theater room and smelled smoke, then followed the smell, and noticed smoke coming out of the mechanical room. She told Olson that when she opened the door, she saw a small fire on the concrete floor. She also told Olson "she had done something with the fireplace that then caused her to go and attempt to flip a breaker . . . just prior to the fire."

[¶7.] Olson also conducted a walk-through of the home. She testified that there were several "red flags" based on her observations of the overall condition of the home. In particular, the furniture in the upstairs living room had been pushed to the middle of the room, there were no photos or paintings on any of the walls, everything had been taken off the bookshelves, multiple areas of the home needed repairs, the carpet had been pulled up in a bedroom downstairs and piled in the center of the room, the staircase to the basement was half painted, and certain personal items such as Krouse's purse, laptop, and contacts were in her vehicle on

the evening of the fire. Because Olson could not determine the cause of the fire, she informed Krouse that she would be recommending that State Farm hire a fire investigator to attempt to determine how the fire started.[1]

[¶8.] State Farm hired Jeff Blomseth to investigate the cause of the fire, and on March 19, Blomseth met with Krouse at the residence. During the interview, Blomseth obtained preliminary information from Krouse regarding what she saw and what happened the night of the fire and whether any issues may have existed in the home such as lighting issues, renovations being made, etc. Krouse's explanation to Blomseth about discovering water in the theater room and then smelling smoke was similar to the version she provided to Olson. Krouse told Blomseth that when she discovered a small fire in a pile of debris on the mechanical room floor, she tried to "move the pile with her foot, a little[,]" and observed small flames within the debris. She explained that she then went to the bathroom adjacent to the mechanical room to wet a towel to put on the fire and called for Veenhof.

[¶9.] During Blomseth's physical investigation of the origin and cause of the fire, he examined the charred debris pile in the mechanical room layer by layer to evaluate what was in there and to determine whether there was a "competent

---

1.  Because of State Farm's suspicions about the fire, it also assigned claims specialist, Julie Mrozle, to assist. Mrozle walked through the home during a later visit and noticed some paperwork suggesting to her that certain bills were past due and unpaid. After running a credit check, Mrozle determined Krouse was current on her mortgage, but she noted that it appeared Krouse had a lot of outstanding debt, which she found concerning. She later received information indicating that Krouse's alimony payments would be decreasing the following year and would eventually cease.

ignition source" for the fire. His examination revealed "a canvas-type drop cloth material[,]" "charred pieces of cardboard[,]" "[s]ome furnace filter-type materials[,]" and "[a] lot of, just, things that [he would] term 'ordinary combustibles,' papers, that type of things."

[¶10.]     Krouse told Blomseth that seven to ten days prior to the fire, she had placed various items of garbage in the area where the debris pile was located, including towel-type materials, an old box of stick matches, latex and acrylic artist paint, and some rags from painting and staining projects completed approximately five weeks prior to the fire. Neither Tjeersdma nor Blomseth located stain rags in the mechanical room, but Blomseth opined that even if such rags had been present, neither stain rags nor anything of that nature caused the fire. He explained that based on his experience and training, staining approximately five weeks prior to the fire and putting the rags in a pile seven to ten days before the fire would not be consistent with a theory that the rags started the fire.

[¶11.]     While Blomseth acknowledged that the stain rags "are capable of self-heating[,]" he explained that these types of fires are "extremely dirty fires" that "will smoke for a long period of time" before producing flames. He further explained that because the pile was on a concrete floor, the floor "would act like a heat sink and would be drawing any heat that it's trying to build up, and it would be dissipating that as it's trying to build it."

[¶12.]     Blomseth concluded based on his initial investigation that the fire was not accidental; however, he testified that he did not know who started the fire. Consequently, he went back to the home on April 1, with an electrical engineer, Dan

Choudek, to further investigate the cause of the fire. Choudek testified that his role involves examining a building's electrical systems to help determine where a fire started. After obtaining background information from Blomseth and conducting his own investigation at the scene, it was clear to Choudek that the fire started in the mechanical room and that there was not an electrical cause for the fire.

[¶13.] Blomseth interviewed Krouse a second time and asked her to once again explain what she had been doing when the fire started. During this subsequent interview, Krouse told him that he should "just look at the video camera because that would record everything." Blomseth then had Choudek collect the video recording from the in-home security system with Krouse's permission.

[¶14.] After considering this additional information, Blomseth maintained his opinion that the fire was nonaccidental. He testified that it was an incendiary fire, one that occurred under circumstances "when there shouldn't have been a fire." After reviewing the video footage, he concluded that the fire was caused by "[t]he application of an open flame to combustible materials." Blomseth described what he observed on the video; in particular, in his view, the footage showed Krouse walking toward the mechanical room while holding an item in her hand that looked similar to a box of wooden stick matches and also showed her retrieve an item from the box and make "what appear[ed] to [him] to be a striking motion" before walking into the mechanical room. After Blomseth viewed the video footage, he informed law enforcement of the video recording and also shared it with Tjeerdsma.

[¶15.] On September 3, 2019, Krouse was indicted on one count of second-degree arson alleging she started the fire with the intent to destroy or damage

property to collect insurance for such loss in violation of SDCL 22-33-9.2. Krouse waived her right to a jury trial, and a three-day court trial began on March 16, 2021.[2]

[¶16.]      In addition to the testimony from Tjeerdsma, Blomseth, Choudek, and Olson, the State presented testimony from Chase Kuhlman, a certified fraud examiner from the South Dakota Division of Criminal Investigation who had examined Krouse's bank records for the three-month period prior to the fire. Although Krouse's bank account had a positive balance of $16,000 at the time of the fire, the amount Krouse was spending each month far exceeded the $63,000 in alimony payments deposited in the account during this timeframe.

[¶17.]      When the State concluded its presentation of evidence, Krouse moved for judgment of acquittal. She claimed that the State failed to present sufficient evidence that she started the fire or that she started the fire with the requisite intent to cause damage in order to collect insurance proceeds. The circuit court denied Krouse's motion.

[¶18.]      As part of her defense, Krouse presented expert testimony from certified fire investigator Cliff Dahl. Dahl testified that he had interviewed Krouse and Veenhof and had conducted an onsite investigation of the fire on May 12, 2020. He also reviewed Blomseth's report. While he agreed the fire originated in the mechanical room, he did not agree with Blomseth's opinion on the cause of the fire. In Dahl's view, based on the information he had received from Krouse, the circumstances leading up to the fire suggested that it was caused by spontaneous

---

2.      Krouse's trial counsel is not the same as her counsel on appeal.

combustion. In particular, he relied on Krouse's statement that there were balled-up rags used for staining woodwork in the mechanical room. Dahl testified that these rags likely started heating within the pile and ignited once being exposed to oxygen in the air. He opined that based on the way the debris pile burned, the fire did not start on top of the pile but rather inside the pile.

[¶19.] Dahl disagreed with Blomseth's testimony that a spontaneous fire was not possible. In Dahl's view, a spontaneous fire could start "anywhere from days to months" after the stain rags were placed in a pile and the pile could smolder without visible smoke for a long time. Based on Krouse's statement to him that she kicked the debris pile, Dahl believed that the introduction of oxygen to the pile started "to get this combustion going in there, which is generating smoke" and then fire.

[¶20.] With regard to the security video footage, Dahl did not believe that the recording depicted Krouse holding a matchbox or that she was striking a match before walking into the mechanical room. He noted that the room was dark, and the video did not show any glow. Ultimately, Dahl opined that the fire in Krouse's home was accidental and Krouse did not start it.

[¶21.] During cross-examination, Dahl acknowledged that when he was first asked to opine on the cause of the fire he stated in his report that if he was asked "to swear under oath if the fire was caused by spontaneous combustion," he would say no. He attempted to explain his differing trial testimony by stating that there is always a possibility that something else happened. Although he offered that he is 99.9% sure that the fire was caused by spontaneous combustion, he acknowledged

that he was not able to sift through the debris pile, as Blomseth had done, because by the time he examined the scene more than a year later, the debris pile was not in the same condition. He also acknowledged that his opinion was dependent on Krouse's statement that the debris pile had contained stain rags.

[¶22.]     Krouse did not testify, but Veenhof testified as a defense witness. He testified about Krouse's plan to sell the home, her hiring of a realtor, and that she was in the process of completing multiple painting and repair projects in the home and removing items so that a realtor could stage the house for a showing. Veenhof testified that on the evening of the fire, recent rainfall on top of two feet of frozen snow had caused water to enter the theater room and after he noticed the water, he informed Krouse. Sometime later that evening, Veenhof and Krouse got into an argument and Krouse went downstairs. While Veenhof was upstairs working on his computer, he heard the smoke alarm go off and then started smelling smoke. He recalled asking Krouse: "Is this a real fire?" According to Veenhof, Krouse was not concerned, and she made a joke about popcorn having started on fire the week prior. He testified that when Krouse came upstairs, she was "kind of running around looking for something" and he thought she might have been looking for flashlights. Krouse then went downstairs.

[¶23.]     Not long afterwards, Veenhof went downstairs and noticed Krouse in the mechanical room looking "visibly startled by the size of the fire." According to Veenhof, Krouse tried to smother the fire with a towel, but "the wind from the towel pushe[d] the flame back" and the fire went straight up and "got really tall really fast" so they ran out of the room. Veenhof explained that they were looking for

water and a bucket but could not find one. When it became apparent there was no way they were going to be able to put out the fire, Veenhof called 911. The recording of this call was admitted as an exhibit and much of the interaction between Veenhof and Krouse was captured on this recording. Veenhof testified that Krouse tried to enter the mechanical room again, but the smoke was too thick. She then switched her focus to finding the cats but could not find them, and Veenhof took Krouse out of the home, where they waited outside barefoot and without coats until the firefighters arrived.

[¶24.]    Krouse also presented testimony from Brad Horstman, who completed an inspection of her home on February 26, 2019, at the request of Krouse because of her plan to sell the home. He testified that although he did not find any major issues with Krouse's home, he noted renovations and maintenance that needed to be completed before a buyer would be interested in the home. He described Krouse as being "very nervous about the process" and "relieved" when there was "no terrible news" to report.

[¶25.]    However, during cross-examination, Horstman agreed that his written inspection report designated several items in the home as being in poor or fair condition and in need of repair. The report also noted water damage and stains in the bathrooms and the mechanical room, as well as a plumbing leak under the kitchen sink, and recommended further evaluation by a contractor to repair these things. Horstman further testified that had there been water in the home during his inspection, that would be a "major problem" that "would take money to fix[.]"

[¶26.] After the defense rested, the State re-called Tjeerdsma in rebuttal. He noted that his report indicated that if he received additional information, his conclusion could change, and he explained that after viewing the video footage and based on everything he now knows, his opinion had changed. Tjeerdsma thereafter opined that ignition by spontaneous combustion would not be consistent with the way the smoke developed as depicted in the video or with the timeline of events presented at trial.

[¶27.] At the conclusion of the case and after closing arguments, the court recessed to deliberate, and the next day, issued an oral ruling. The court first identified the elements of the crime for which Krouse had been charged and noted that the State has the burden to prove each element beyond a reasonable doubt. The court then briefly summarized the evidence presented, stating that Krouse's "versions of her movements in the minutes prior to the fire's outside break are not consistent with the evidence." The court summarized events captured on the video recording. In particular, the court noted that the video depicted Krouse carrying a rectangular object approximately the size of a kitchen matchbox into the mechanical room; smoke emitting from the room approximately two minutes after Krouse entered; Krouse exiting the room while smoke was emitting; Krouse thereafter standing near the doorway "watching where there is now obviously a growing fire within the room"; and Krouse walking "slowly upstairs." The court found that based on its review of the video, Krouse's "pace" and "body language" suggest "an absence of panic." The court rejected Krouse's theory and her expert's opinion that the fire started as a result of spontaneous combustion, in part, because the expert

indicated in his May 15 report that he could not swear under oath that the fire was caused by spontaneous combustion. The court noted there was "no significant evidence of fire origin or cause in the record to explain why" Dahl was now able to offer a contrary opinion. The court found Krouse guilty of second-degree arson, concluding that the State met its burden of proof beyond a reasonable doubt.

[¶28.] Krouse appeals, and the issues raised are restated as follows:

1. Whether the circuit court's factual findings are legally sufficient to support a conviction of second-degree arson.

2. Whether the circuit court erred when it denied Krouse's motion for judgment of acquittal.

3. Whether Krouse was denied her constitutional right to due process.

### Analysis and Decision

### *1. Whether the circuit court's factual findings are legally sufficient to support a conviction of second-degree arson.*

[¶29.] Krouse contends that this Court's review of the circuit court's guilt determination is confined to the circuit court's findings of fact. She further claims that her conviction for second-degree arson in violation of SDCL 22-33-9.2 cannot stand because the circuit court did not issue an express finding that she acted with the intent to damage or destroy property to collect insurance for the loss. She acknowledges that neither party made a request that the court specially enter findings of fact. *See* SDCL 23A-18-3 (providing that a court may find facts specially on request). However, because the court sua sponte made findings of fact to support its guilt determination, Krouse asserts that under *State v. Nekolite*, 2014 S.D. 55, 851 N.W.2d 914, "this Court cannot look to evidence outside the [c]ircuit [c]ourt's

-12-

factual findings for purposes of appellate review, unless it first finds that those factual findings were clearly erroneous." She then contends that the circuit court's "only conceivable" findings bearing on her intent were that Krouse was a former employee of State Farm and that she submitted a claim to her insurer the day after the fire. Krouse characterizes these as "garden variety facts" that "are hardly related to an accused's criminal state of mind."

[¶30.]    Krouse's reliance on *Nekolite* is misplaced. In *Nekolite*, the magistrate court's guilt finding was appealed to the circuit court. In affirming the conviction, the circuit court relied on testimony in the record from a law enforcement officer. 2014 S.D. 55, ¶ 4, 851 N.W.2d at 916. However, the magistrate court had implicitly rejected the officer's testimony when it based its oral findings on a different version of events provided by the defendant in his trial testimony. *Id.* On appeal to this Court, Nekolite argued that the circuit court could not, under SDCL 23A-18-3, uphold the magistrate court's verdict by relying on testimony that was inconsistent with the magistrate court's findings. In response, the State noted that neither party had asked the magistrate court to issue special findings and claimed that the magistrate court only made a general finding of guilt. The State thus contended that the circuit court could properly rely on the officer's testimony on appeal. *Id.* ¶ 10, 851 N.W.2d at 917.

[¶31.]    Under SDCL 23A-18-3, "[i]n a case tried without a jury a court shall make a general finding and shall in addition, on request made before submission of the case to the court for decision, find facts specially. Such findings may be oral." This Court in *Nekolite*, after noting that "SDCL 23A-18-3 is similar to Rule 23(c) of

the Federal Rules of Criminal Procedure[,]" *see* 2014 S.D. 55, ¶ 11, 851 N.W.2d at 917, looked to federal case law for guidance on the question of the proper scope of review when a court finds facts specially compared to making a general finding of guilt. Thereafter, the Court determined that when a trial court makes a general finding of guilt, "an appellate court may 'imply findings to support the judgment if evidence, when viewed in a light most favorable to the government, so warrants.'" *Id.* ¶ 13 (citation omitted). However, "when factual findings have been made, and those findings are not clearly erroneous, an appellate court may not *set aside* those findings and imply *contradictory* findings." *Id.* ¶ 13, 851 N.W.2d at 918 (emphasis added). The Court concluded that the circuit court "usurped the magistrate court's role as the fact-finder" when it adopted testimony directly in conflict with the magistrate court's findings. *Id.* ¶ 15, 851 N.W.2d at 918–19. The Court explained that because the magistrate court's "ultimate finding of guilt" at trial "was 'based upon' its oral findings of fact made on the record" *and the findings were not clearly erroneous*, those findings "were the applicable facts for appellate review." *Id.* ¶ 14, 851 N.W.2d at 918.

[¶32.] Here, like in *Nekolite*, neither party requested that the circuit court enter special findings under SDCL 23A-18-3; rather, the circuit court sua sponte made some oral findings as to certain evidence when rendering its guilty verdict. Also, similar to the magistrate court's findings in *Nekolite*, there is no claim in this appeal that any of the circuit court's findings are clearly erroneous. Thus, in reviewing the sufficiency of the evidence on appeal, this Court may not usurp the fact-finding role of the circuit court by relying on evidence that conflicts with the

-14-

circuit court's findings. Contrary to Krouse's argument, however, this Court may rely on other record evidence that is not inconsistent with the circuit court's findings to determine whether the court's ultimate finding of guilt is sufficiently supported. This includes reviewing the record for evidence supporting that Krouse acted with the requisite intent.[3] *See Nekolite*, 2014 S.D. 55, ¶¶ 20–24, 851 N.W.2d at 919–22 (examining the record evidence to determine whether Nekolite was in actual physical control of his vehicle such that the magistrate court's verdict could be sustained).

### 2. Whether the circuit court erred when it denied Krouse's motion for judgment of acquittal.

[¶33.] Krouse notes that under SDCL 22-33-9.2(2), the State was required to prove beyond a reasonable doubt that (1) she started the fire and (2) that she acted with the intent to destroy or damage property to collect insurance for the loss. She argues that a finder of fact could not have concluded beyond a reasonable doubt that either element was met and thus contends that the circuit court erred in denying her motion for judgment of acquittal.

[¶34.] It is well settled that:

---

3. Krouse's reliance on a federal court case for the proposition that because the circuit court did not make an express finding that she acted with the requisite intent, this Court cannot look to the record in its entirety "to fill in any gaps" on that element, is also misplaced. *See United States v. Milton*, 421 F.2d 586, 587 (10th Cir. 1970). *Milton* is distinguishable because the district court had misconceived the nature of the charge and failed to recognize an essential element of the offense. Here, in contrast, the circuit court correctly identified the applicable elements of the crime of second-degree arson, including that the State must prove that Krouse acted with a specific intent, and necessarily found that the State met its burden of proof when finding Krouse guilty.

"[A] motion for judgment of acquittal attacks the sufficiency of the evidence, which is a question of law whether the motion is considered before or after the jury's verdict." *State v. Wolf*, 2020 S.D. 15, ¶ 12, 941 N.W.2d 216, 220. "A question regarding the sufficiency of the evidence to sustain a conviction is reviewed de novo." *State v. McReynolds*, 2020 S.D. 65, ¶ 11, 951 N.W.2d 809, 814. When reviewing the sufficiency of the evidence, the Court considers "[w]hether there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt." *Wolf*, 2020 S.D. 15, ¶ 13, 941 N.W.2d at 220 (citation omitted). On review, the Court "accept[s] the evidence and the most favorable inferences that can be fairly drawn from it that support the verdict." *Id.* (quoting *State v. Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d 329, 342). This Court does not "resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence on appeal. If the evidence including circumstantial evidence and reasonable inferences drawn therefrom sustain a reasonable theory of guilt, a guilty verdict will not be set aside." *Id.* (quoting *Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d at 342).

*State v. Ahmed*, 2022 S.D. 20, ¶ 14, 973 N.W.2d 271, 221. The sufficiency of the evidence as to each element is examined below.

### a.      *Whether the State presented sufficient evidence to sustain a finding that Krouse started the fire.*

[¶35.]      Krouse contends that Blomseth's opinion that she started the fire was biased, self-serving, and insufficient to support that she intentionally started the fire. She contrasts his opinion with the report Tjeerdsma issued after his investigation, in which Tjeerdsma concluded that the fire was accidental and had an undetermined cause. In her view, "[t]he conflicting opinions between Tjeerdsma and Blomseth as to the cause belie any reasonable finding that the State proved beyond a reasonable doubt that Krouse started the fire."

[¶36.]      She further asserts that the State's evidence overall was insufficient because it "is based on speculation as to [her] actions and movements." She claims

that "[t]he State put on no additional evidence to show that [she] intentionally started this fire in her house" besides the in-home video footage and Blomseth's testimony relating what he "purportedly" saw on that footage. She contends that "[t]he video does not show a match light up" and it does not show her igniting the pile of debris. She therefore asserts "the State failed to prove beyond a reasonable doubt that [she] started the fire."

[¶37.] The circuit court watched the video footage and considered the evidence presented concerning Krouse's statements about her movements prior to the fire starting. The court ultimately found that Krouse's movements as depicted in the video footage were not consistent with what she claimed she had been doing. Our review of the footage on appeal leads to the same conclusion.

[¶38.] The video shows Krouse coming down the stairs, wearing a sweater, carrying what appears to be a wine glass, and walking toward the theater. About a minute later, the video shows her walking slowly back into the family room from the theater area with her hand over her mouth. Krouse does not enter the mechanical room. Instead, she walks toward a different side of the family room and disappears from sight for several minutes. The video then shows Krouse walking back toward the theater, but she stops, pauses, then turns around and slowly walks to the kitchen/bar area, while still holding what appears to be a wine glass. After looking at a book for a minute or so, Krouse walks toward the bedroom area, and about a minute later, she walks back into the kitchen for a few minutes and then slowly upstairs. None of the video footage during this fourteen-minute timeframe shows Krouse entering the mechanical room.

[¶39.] Four minutes after going upstairs, the video shows Krouse, with her sweater now draped off her shoulders, coming down the stairs and walking toward the mechanical room. As she enters the mechanical room, Krouse is holding something in her hand that is consistent with the size and shape of a kitchen matchbox.[4] Approximately two minutes later, smoke begins to emerge from the doorway to this room. After three and a half minutes, Krouse comes out of the room, with her sweater now hanging from one wrist. She then stands by the doorway for 20 seconds, looking into the room and watching the smoke, while still holding something in her left hand. Thereafter, she walks slowly toward the stairs but turns around and walks back to the mechanical room and reenters. She comes back out of the room a few seconds later, goes back in again for another ten seconds, then comes out, puts her sweater back on, and goes upstairs. None of this is done in a hurried fashion. A minute later Krouse walks down the stairs and toward the mechanical room holding a towel and waiving it a couple times in the air as she walks into the room. The video also shows Veenhof walking down the stairs shortly afterward and going into the bedroom area. The recording then cuts off.

[¶40.] In essence, Krouse seeks reversal because the video does not directly show her starting the fire. However, this Court "will not set aside a verdict '[i]f the evidence, including the circumstantial evidence and reasonable inferences drawn therefrom, sustains'" the circuit court's guilt finding. *State v. Abdo*, 2018 S.D. 34, ¶ 25, 911 N.W.2d 738, 744 (citation omitted). Moreover, contrary to Krouse's

---

4. It is possible that Krouse makes a striking motion while walking into the mechanical room, as claimed by Blomseth, but the video is grainy, and it is hard to discern with clarity what she is holding and doing with her hands.

interpretation of the evidence in a light most *unfavorable* to the verdict, this Court is required to "accept the evidence, and the most favorable inference fairly drawn therefrom, which will support the verdict." *See id.* (citation omitted). Because the evidence and most favorable inferences that could be drawn therefrom support that Krouse started the fire, there is sufficient evidence in the record to sustain the circuit court's finding of the same.[5]

### b. Whether the State presented sufficient evidence to sustain a finding that Krouse acted with the requisite intent.

[¶41.]    Krouse asserts that the State "presented nothing more than rank speculation, thinly veiled as evidence, as to [her] purported criminal state of mind." In particular, she contends that the evidence of her financial circumstances was insufficient because "it failed to account for [her] comfortable alimony, supplemental income, the equity in her home, and the fact that she planned to list the home for sale." She further contends that there is no evidence to support that at the time she started the fire she intended to destroy or damage property to collect insurance for the loss. Finally, she argues that the circuit court could not rely on conduct that

---

5.    Krouse relies on a theory advanced by her trial counsel in his opening statement regarding her actions inside the mechanical room that cannot be seen on the video. Counsel suggested that Krouse entered the mechanical room with a box of flashlights (rather than a matchbox) in hand, then used a crawl space in the mechanical room to go into the theater room to investigate the source of the water in that room and this is when she first smelled smoke. Although trial counsel attempted to elicit testimony from Veenhof explaining what Krouse had told him about her actions, the State objected on hearsay grounds, and the court sustained the objection. Therefore, the trial record lacks evidence supporting this defense theory. But even if testimony of this nature had been admitted, it would not explain Krouse's inculpatory actions and demeanor captured on video after smoke starts emitting from the mechanical room.

occurred *after* the arson—namely her submission of the claim to State Farm—to conclude she acted with the requisite intent.

[¶42.] Contrary to Krouse's claim, the circuit court could consider her conduct after the fire, including the fact that she promptly submitted a claim to State Farm specifically to collect insurance for the loss. Such evidence is probative on the question whether she acted with the requisite intent at the time she started the fire. Neither case cited by Krouse (*State v. Jackson*, 2009 S.D. 29, 765 N.W.2d 541 and *State v. Swalve*, 2005 S.D. 17, 692 N.W.2d 794) suggests otherwise.[6]

[¶43.] The fact that Krouse submitted a claim to State Farm the day after the fire bears directly on her intent in starting the fire. As this Court has said, "[b]ecause the nature of intent is such that it is 'rarely susceptible to direct proof, the fact finder may determine intent by such reasonable inferences and deductions as may be drawn from facts proved by evidence in accordance with common

---

6. *Jackson* is factually distinct from the case here. 2009 S.D. 29, 765 N.W.2d 541. In *Jackson*, the State had to prove that the defendant contractor had the intent to deceive at the time he accepted the down payment on a roofing contract. In distinguishing what is required to prove a criminal theft, as opposed to a civil breach of contract, this Court found that the contractor's "post-inducement conduct" (e.g., failure to complete certain tasks) was insufficient to prove his intent to defraud at the time the contract was formed. *Id.* ¶ 21, 765 N.W.2d at 547.

   *Swalve* was also a grand theft case, wherein an automobile dealer failed to pay off existing liens on trade-in vehicles sold to unsuspecting customers. 2005 S.D. 17, ¶ 8, 692 N.W.2d at 797. The post-crime conduct the Court found to be irrelevant was offered by Swalve to show he did *not* have the intent to defraud, i.e., evidence of his later act of giving money to the complaining customers for partial payment toward the outstanding liens. *Id.* ¶ 16, 692 N.W.2d at 799. Notably, the Court observed that this type of post-crime conduct is precluded under a specific statutory directive that "restoration or return of property is not a defense nor may it be considered by the finder of fact." *Id.* ¶ 16 (alteration omitted) (quoting SDCL 22-30A-10.1).

experience and observation.'" *State v. Holzer*, 2000 S.D. 75, ¶ 16, 611 N.W.2d 647, 652 (citation omitted). "The actor's 'state of mind' at the time of the offense may also be determined from his acts, conduct and inferences which are fairly deducible from the circumstances *surrounding* the offense." *Id.* ¶ 15 (emphasis added) (citation omitted).

[¶44.] In addition to the evidence that Krouse put in a claim with State Farm (which when viewed in combination with the evidence showing that Krouse intentionally started the fire would support a reasonable inference that Krouse started the fire to collect insurance proceeds) a review of the court's oral findings and additional evidence in the record further support that she acted with the requisite intent. In particular, the State presented evidence that Krouse had to complete a number of renovations and repairs before her house could be listed for sale, and then to compound matters, on the night of the fire, the recent storm resulted in standing water in the theater room. The State also presented evidence revealing that during the months preceding the fire, Krouse's expenditures far exceeded her monthly alimony income, that Krouse was familiar with fire insurance claims given her past employment with State Farm, and that she started a fire in the mechanical room where she could conceivably blame other ignition sources for the fire. It is reasonable to infer from this evidence that at the time Krouse started the fire, she acted with the intent to submit a fraudulent claim to collect insurance proceeds for the loss. Therefore, there is sufficient evidence in the record to sustain a finding that Krouse acted with the requisite intent at the time she started the fire.

[¶45.] Krouse has "not identified how the evidence in the record—if believed by the [court]—fails to sustain the finding of guilt beyond a reasonable doubt[.]" *See State v. Hemminger*, 2017 S.D. 77, ¶ 40, 904 N.W.2d 746, 759. Rather, she simply contends that this Court should weigh the evidence differently. This we cannot do. The circuit court did not err in denying her motion for judgment of acquittal.

### 3. *Whether Krouse was denied her constitutional right to due process.*

[¶46.] Krouse alleges that because private investigators, like Blomseth, are not subject to the same constitutional constraints as law enforcement, her right to a fair trial was impeded.[7] To her, this "in and of itself is the issue in this case" because Blomseth, on behalf of State Farm, "essentially conducted the entire criminal investigation of Krouse in a manner that was neither subject to the same procedural requirements imposed on law enforcement nor capable of attack under standard criminal procedure." She also contends that her "constitutional right to a fair opportunity to defend against the charges" was undermined because "[t]he entirety of the State's case-in-chief was laced with an incurable bias" of State Farm "that criminal investigations do not and cannot have."

[¶47.] This Court has consistently held that "every accused, innocent or guilty, is entitled to a fair trial." *State v. Pellegrino*, 1998 S.D. 39, ¶ 25, 577 N.W.2d

---

7. Krouse advances additional arguments to support her view that she was denied her right to a fair trial. In addition to the fact that her contentions are without legal or factual support, each of these claims are asserted for the first time on appeal. It is well settled that "[w]hen an issue is raised for the first time on appeal this Court need not consider it." *See LP6 Claimants, LLC v. S.D. Dep't of Tourism and State Dev.*, 2020 S.D. 38, ¶ 24, 945 N.W.2d 911, 918. We therefore decline to address them.

590, 600 (citation omitted). "[D]ue process is in essence the right of a fair opportunity to defend against the accusations." *State v. Packed*, 2007 S.D. 75, ¶ 23, 736 N.W.2d 851, 859 (quoting *State v. Luna*, 378 N.W.2d 229, 233 (S.D. 1985)). "An alleged violation of a defendant's constitutional right to due process is reviewed de novo." *State v. King*, 2014 S.D. 19, ¶ 4, 845 N.W.2d 908, 910.

[¶48.] Although Krouse contends that her ability to defend against the charges was undermined, a review of the record does not support that she was denied a meaningful opportunity to present a complete defense. While Krouse refers to Blomseth's alleged bias and State Farm's financial motivation, she was not denied the opportunity to argue these points to the circuit court. Similarly, even if her expert could not conduct a "full-blown investigation" because items had been moved by State Farm's investigator, the circuit court was able to consider these circumstances in reaching its decision. Moreover, whether her expert might have found something different had law enforcement inspected the scene rather than Blomseth is speculative. Krouse was not deprived of her constitutional rights to due process and a fair trial.

[¶49.] Affirmed.

[¶50.] JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur.